HOPPIN vs. DOTY AND LENNAN, impleaded with another.

EQUITY.— *Purchase of land : Inadequate price as evidence of mala fides.— Sale of land on prior mortgage : Notice to purchaser of the rights of holder of subsequent mortgage, not made a party.*

1. Where one bought land for $100, knowing that it was worth $2,000 or $3,000, and that, although his vendor's title was acquired several years before, the original owner still continued to reside upon the land, these circumstances were sufficient to put him on the strictest inquiry as to the rights of other parties.

2. Where such purchaser also knew that the vendor acquired his title at a mortgage foreclosure sale, and that there was an outstanding subsequent mortgage to a railroad company, and also knew circumstances showing that in all probability said second mortgage was in the hands of some assignee who was not a party to the foreclosure of the first mortgage: *Held*, that he was chargeable with bad faith in his purchase, and the holder of the second mortgage was entitled to redeem from him.

APPEAL from the Circuit Court for *Juneau* County.

In March, 1854, *Lennan* executed a mortgage of about two hundred acres of land in Columbia county, to secure

his note to the La Crosse and Milwaukee Railroad Company for $400; and the company, in 1855, assigned the mortgage, for value, to persons from whom plaintiff purchased it in 1856. There was, however, no record in the register's office of said county of any assignment of the mortgage; and the evidence herein shows that the mortgage and note were attached to a bond of the railroad company for $4,000, running to James Ludington or bearer, in which bond it was stipulated, that, as security for the payment thereof, the company thereby assigned and transferred said note and mortgage to the holder of said bond, and that they should be transferable in connection with said bond, and not otherwise. There was a prior mortgage on one hundred and sixty acres of the same land, made by Lennan, in 1852, as security for the payment of $112, with interest; and this mortgage was foreclosed in 1861, at the suit of one Smith, who then held it; and the land was purchased by H. B. Munn, for about $300, the amount of the mortgage debt, costs, etc. The present plaintiff was not made a defendant to said foreclosure suit. The La Crosse and Milwaukee Railroad Company was named as a defendant therein, and the summons was served upon one West, as its secretary, but the company did not appear in the suit. The defendant Lennan appeared in that action by John Condon, Esq., as attorney. Munn afterward, in 1865, sold and conveyed said premises to the defendant Doty. In 1866 the present plaintiff commenced an action to foreclose his mortgage, making Lennan, Doty and others defendants, and charging that Munn and Doty acquired the title for the benefit of Lennan, and were colluding and conspiring with him to enable Lennan to hold the premises discharged of the lien of plaintiff's mortgage. The judgment demanded was for a sale, with foreclosure of the equity of redemption, as against all the defendants; and plaintiff did not ask to redeem from Doty. Doty answered, alleging that Munn and himself were purchasers in good faith, for a valuable considera-

tion, and denying collusion with *Lennan ;* and after a verdict in his favor on the issues thus raised, the court dismissed the complaint as to him, without prejudice to plaintiff's right to litigate the validity of his (*Doty's*) title in another suit; and it rendered a judgment of foreclosure and sale as against the other defendants. On appeal by the plaintiff to this court, said judgment was affirmed. See 22 Wis. 621–625.

Afterward, in 1868, the plaintiff offered to redeem the land from *Doty*, and to pay him whatever upon an accounting might be found equitably due ; and, this being refused, the present action was brought against *Lennan, Doty* and ·one *Henni* (who had purchased ten acres of the land from Munn). The complaint herein alleges, *inter alia*, that at the time of the commencement of the action to foreclose the Smith mortgage, the La Crosse and Milwaukee Railroad Company had ceased to exist, and had no officers or agent upon whom legal process could be served ; that plaintiff was then holder and owner of the mortgage to the railroad company, and did not know of the action brought by Smith until December, 1864 ; that neither the said railroad company nor plaintiff appeared in said action, and plaintiff is informed and believes that the court never obtained jurisdiction of said company ; that Munn, at the time of his purchase aforesaid, had full knowledge of the existence of plaintiff's mortgage, and of the fact that the railroad company was not the owner thereof at the commencement of said foreclosure suit by Smith, nor at the times when judgment was rendered therein and said sale made ; that *Doty* did not pay Munn for the premises over $200, while they were worth $3,000; that *Doty*, at the time of his purchase from Munn, had full knowledge of the nature of Munn's title, and of the existence of plaintiff's mortgage, and of the fact that it was not the property of the railroad company when the Smith foreclosure suit was brought, or the judgment rendered, or the sale made

therein, and of the fact that Munn's estate or interest was subject to plaintiff's right of redemption. The complaint further alleges that the forty acres covered by plaintiff's mortgage, and not included in the premises purchased by Munn and sold by him to *Doty*, are unimproved, and worth not over $400 (the indebtedness to plaintiff upon *Lennan's* note and mortgage being over $7,000) ; and that *Lennan* is wholly insolvent. It further avers that the use of the premises, while held by *Doty*, was worth $200 a year; that plaintiff had demanded of *Doty* an account of the rents, issues and profits of said 160 acres, since the date of his deed from Munn, and had offered to account with him concerning the same, and to allow him, upon such accounting, whatever was equitably his due, and had demanded that he execute and deliver to plaintiff a quitclaim deed, or proper release, of all that part of said 160 acres owned by him, and surrender possession thereof, on such accounting being had and the amount found due being paid; but that *Doty* refused, etc. ; and that plaintiff is ready and willing to pay, etc. It further states that plaintiff's judgment aforesaid remains wholly unpaid and in full force, and no part of the premises has been sold thereon. The other allegations are not important here. Prayer, that an account might be taken of what was due *Doty* and *Henni* for principal and interest on the mortgage under which they purchased ; also an account of the rents and profits of said 160 acres, received by *Doty* since his purchase ; that if said rents and profits should appear to be more than sufficient to satisfy the principal and interest of the Smith mortgage, the residue might be paid over to plaintiff; that plaintiff might be permitted to redeem the premises ; that defendants might be adjudged to deliver up the possession thereof to the plaintiff ; that *Doty* might be restrained from interfering with said premises, or the rents, etc., thereof, and from conveying or incumbering them, etc. ; and

for a receiver to take possession of the land *pendente lite*, etc. ; and for general relief.

*Doty* answered, denying all the material allegations of the complaint, except the making of the mortgage to the railroad company, the foreclosure of the prior mortgage to Smith, the purchase of the land by Munn at the foreclosure sale, and the purchase by said defendant from him, and the facts of record as to the former suit by the present plaintiff to foreclose his mortgage. The denials included all allegations of the complaint as to any knowledge by Munn or *Doty* of the fact that the plaintiff or any other person than the railroad company owned the mortgage in question at the times when the foreclosure suit upon the Smith mortgage was commenced, and the judgment rendered and sale made therein, or when *Doty* purchased of Munn. There was also an answer by *Lennan*, with similar denials.

At the trial, the record of the Smith foreclosure, and also the record of the plaintiff's former suit upon his mortgage, were read in evidence. The plaintiff also read in evidence the deposition of Mr. Munn, which stated in substance as follows: That in January, 1862, he resided in Portage City, Columbia county, and had resided there since 1854; that he was then a real estate and insurance agent and attorney-at-law, his law business being for the most part confined to real estate; that during that month he attended in person the sheriff's sale of the land in question upon foreclosure of the Smith mortgage, and bid off the land in his own name; that he took the sheriff's deed as an absolute conveyance; that his attention was called to the sale as offering a good chance for investment, and he purchased the land to make money; that he paid about $300; that he was acquainted with *Lennan* at the time, and had known him for several years; that *Lennan* then resided on said land, which was known as "*Lennan's* farm;" that he (witness) was never in the actual occupancy of the land, and never

leased it, because he expected to sell it; that he 'had a verbal understanding with one Condon (deceased) to sell the land to him, or such person as he might designate, "but no name was given, no time fixed, no consideration agreed upon, further than that the same should be reasonable ;" that before the sale Mr. Condon advised witness of it, and urged him to attend it and purchase the land as a good business operation, promising, in case of his purchasing, to take it off his hands at a handsome advance, or have some other person do it; that at the sale, the sheriff offered the land in the usual way, and witness did not remember whether there were any opposing bids or not, but on his bid the land was struck off in the usual way, at his request and for his benefit; that he held the title about three years, and then conveyed the land to *Doty*, in consideration of money paid, and because he wanted to sell; that he was not requested by any person to make the sale; that witness was engaged at the time in closing up his business, preparatory to leaving Portage City; that Mr. Condon, for some time before his decease, had failed to make good his verbal promise, although witness had frequently called his attention to it, and told him he should make some other disposition of the matter, unless he (Condon) closed it up; that Condon urged him not to do it, and paid him some money on two or more occasions; that after Condon's decease, and while witness was arranging to leave Portage City, he called on *Mr. Lennan*, who (witness believed) was in the occupancy of the land, and advised him (*Lennan*) that he (witness) should make a sale of the land, as he wanted to get his money out of it without trouble; that at this time *Doty* was collector of taxes for the city of Portage, and witness was frequently in his office, paying taxes for himself and others, and sometimes, in the course of his business, *Doty* would call at witness's office; that witness's impression is, that this purchase of the *Lennan* farm was the subject of conver-

sation on several occasions between them, and that *Doty* first called on witness in regard to it, but he might be mistaken; that witness was anxious to close the matter up, and, if possible, to do it with some person whose relations with *Lennan* were friendly; that he conveyed the land to *Doty* at the request of the latter; that he received about $100 from *Doty*—it may have been more—"for the direct conveyance to him;" that "indirectly, from Mr. Condon," he received about $250; that Mr. Condon paid him this in different amounts and at different times, generally after having his attention called to the matter; that he (witness) sold the land to *Doty* at a lower figure than he would have done if this amount had not been received from Condon; that he did not know whether the land was assessed to him while the title was in him, and did not remember to have paid any taxes, and did not know who did; that at the time he took the sheriff's deed, he did not know and had not before then heard, where the railroad mortgage on said land was, or whether the railroad company had sold the same, or who owned it; that at the time of the sale he had been informed that large numbers of those mortgages had been sold, and possibly presumed *Lennan's* among the rest; that all his information on the subject of the sale was derived from Mr. Condon, and as the latter did not advise him for whom he was acting, or tell him what *Lennan's* motives were, he (witness) was unable to state of his own knowledge what *Lennan's* object was [in allowing the land to be sold on the Smith mortgage]; that he could not state how it happened that he was able to purchase the land at so low a price, further than that he bid on the land and the sheriff accepted it; that the question whether the lien of the railroad mortgage upon the land would be cut off by said sale was discussed between himself and Condon before the sale, and they thought it would be cut off, though it would be such a cloud on the title as might require some law proceedings

to remove ; that his (witness's) knowledge about the date of the railroad mortgages, and 'the intention of the purchaser to attempt to force payment, was such as was current in the county ; that he had no actual knowledge of specific facts ; that as to the question whether by the sale on foreclosure of the Smith mortgage the equity of redemption of the holder of the railroad mortgage would be cut off, he did not remember that this question was considered by him before said sale, but thought it was not ; that he was a resident of Portage city while the La Crosse and Milwaukee R. R. Company was grading its road through that city [prior to said sale], and did not then know how the company raised money to grade its road, further than the common report that it was by sale of its bonds, etc. ; that he had heard at that time that the object of the company in taking these farm mortgages was to use them as a basis of credit upon which to raise money ; that the company openly represented that the mortgages were wanted for that purpose, and (witness thought) for that purpose only ; that he had learned in some way that the mortgages were passed as collateral securities along with the company's bonds ; that he understood that, although at first transferred by simple delivery, they were subsequently assigned in the usual manner ; that the railroad mortgage was to be cut off by the sale to him on the prior mortgage, in favor of and for the benefit of the purchaser ; that he made no inquiries at the time as to whether by said sale the railroad mortgage would be cut off ; that the La Crosse and Milwaukee R. R. Company was understood to be insolvent at the time of said sale, and his recollection was that it became so, or was generally believed to be so, in 1858 or 1859.

The plaintiff also called *Doty* as a witness, who testified that when he bought the land of Munn he did not know of any railroad mortgage on it ; that he might have heard that there had been such a mortgage ; that in buying the land he had only the same object in view that any

other person has in buying property ; that his impression was that Munn first opened the negotiation, said he was closing up his business at Portage City, and proposed to witness to sell him the property ; that witness did not visit the property after that offer, but knew where it was, and had been past it within two or 'three months previous ; that there was then a house, with some out-buildings, on the place, and he thinks that *Lennan's* family, or some of them, then lived there ; that the man who was with him when he passed it pointed out the place as being *Lennan's* place; that he was told that *Lennan* lived on, or was in possession of, the land ; that he supposed that he (*Lennan*), or his family, or some part thereof, were living there, but had no actual knowl-edge of it ; that Munn asked him, and he paid, $100 for the land ; that at that time Munn mentioned the quantity of land under cultivation, and there was a considerable quantity, but witness cannot now state how much ; that soon after getting the deed from Munn, witness called on *Lennan* to know if he wished to rent the place, and informed him that he must lease the place or leave it ; that *Lennan* said he would lease it ; that witness had had no conversation with *Lennan* before purchasing of Munn ; that Munn did not tell him, nor state in his hearing during the negotiation, that it would be agreea-ble to *Lennan* if witness should buy the land ; that he (Munn) might have said that *Lennan* was in the posses-sion ; that he said nothing about the probability of diffi-culty with *Lennan* about the title, or in getting *Lennan* out ; that witness might have had several conversations with Munn about the purchase before concluding it ; that Munn was in the habit of coming to his office, and wit-ness was in the habit of going to Munn's office, on busi-ness ; that Munn assured him that his title was good, and witness only knew what Munn told him about it ; that he knew Munn was in the land business, and had confidence in what he told him ; that he did not know of

his own knowledge what the property was worth, but thought it was worth more than he agreed to give for it; that Munn did not tell him how much he had paid for the land; that witness has no recollection of Munn's telling him that Condon or any other person had paid him the greater portion of what he (Munn) had paid for the land; that Munn might have told him that he got the land on a foreclosure of the Smith mortgage, but witness has no distinct recollection about it; that he supposed he was getting a clear, perfect and undisputed title to the land; that he had no connection with *Lennan* before purchasing of Munn, and did not inquire of any one, before closing that purchase, whether *Lennan* had any claim on the property; that he thinks he had heard, before that, that there was a railroad mortgage on the land; that he don't know whether he thought particularly, at the time of the purchase, whether Munn's title and deed to him cut off the railroad mortgage; that he does not know whether he had any particular understanding as to how it happened that he was able to buy the property so cheaply.

It appeared that in March, 1865, *Doty* leased the land to *Lennan* for three years, at an annual rent of $125, the lessee covenanting to keep the fences and buildings in good repair, pay all taxes, cultivate the land, and peaceably deliver it to the lessor at the end of the term; and the lessor agreeing to allow upon the rent the value of whatever improvements the lessee might make. It appeared, also, that in the quitclaim deed from Munn to *Doty*, the consideration named for the 150 acres purchased by the latter is $1,500.

There was evidence for the plaintiff tending to show that West was not, and that another person was, the secretary of the railroad company, at the time the summons in the action to foreclose the Smith mortgage was served on West; but this evidence (which was received against objection) need not be stated here.

For the defense, another deposition of Mr. Munn was read, which stated, in substance, as follows : That when he purchased on the Smith foreclosure he supposed the title purchased was such as is usually obtained on a foreclosure, when all parties interested have been made parties to the suit — that it was valid and free from incumbrance ; that he knew at that time of no outstanding incumbrance of any kind, but supposed the sheriff's deed gave him a title free from any incumbrance ; that he knew of no transfer by the railroad company of the mortgage made to it, and had received no notice of such transfer.

On cross-interrogatories he stated that he was examined as a witness in plaintiff's behalf in 1867, in the former action by this plaintiff, then pending, and had given certain answers, the substance of which, as recited in said deposition, is as follows : That he took the sheriff's deed on the Smith foreclosure as an absolute conveyance of the premises, subject, however, to a verbal promise that he would sell and convey the land for a reasonable consideration ; that at the time of the purchase he told Mr. Condon that for a reasonable consideration he would at any time sell and convey the farm to any person he might designate ; that no person was named at the time, and there was no agreement or understanding further than this ; that when witness was closing up his business at Portage City, Mr. Condon having died without leaving any request as to his selling or conveying the property to any particular person, witness mentioned to *Lennan* that he was going to leave, and before doing so should sell said land, but preferred selling it to some person that was friendly to him (said *Lennan*) ; that some time after this, *Doty* called on him at his office, and wanted to know what he would take for his title, and the terms were finally agreed upon, *Doty* paying him all he asked ; that he conveyed the land to *Doty* at the request of the latter, and because *Lennan*

had told him that he had no objection to the sale being made to *Doty;* that his impression was that when he bought the land it was worth, with the buildings then upon it, about $3,000; that he did not remember ever having paid any taxes on the land, but if he did they probably entered into his estimate in making the sale to *Doty;* that he did not know who occupied the dwelling on said land, but was informed that *Lennan,* or some member of his family, or some connection, friend or tenant, occupied it; that he did not know who had the use, income or profit, if any; that previous to his purchase he had heard that there was a mortgage on the land running to the La Crosse and Milwaukee R. R. Co., and also that the company had sold, forfeited, pledged or traded off the same, but he did not know who owned or claimed to own it; that at the time he made the purchase he was advised and believed that his title would be good, and that the sheriff's deed would cut off the railroad mortgage, otherwise he should not have purchased; that it would be very difficult for him to determine all that he knew on the subject of the railroad mortgages at the time of said purchase, as his information came along from time to time, but he thinks that he had been informed that parties in Milwaukee had purchased up large quantities of these mortgages, and *Lennan's* among the rest, and that forced payment was to be attempted. In his answers to the above-mentioned cross-interrogatories, the witness says that at the time he made this deposition, in 1867, he thought the statements then made by him were true; that his answers at that time were made hurriedly, in the press of business, at a place distant from Portage City, and long after the facts to which they related had occurred; that in June, 1868, while on a visit to Portage City, his attention was called to them by counsel in the case; that a printed copy of the testimony was furnished him, and on reading it carefully he discovered that some of the statements were in-

accurate, and that others might be incorrect ; that in said deposition he had stated that *Doty* called on him at his office, etc., when the fact may have been that the conversation occurred at *Doty's* office, as witness frequently called upon *Doty* as city treasurer, to pay taxes ; that he had further stated that he had heard the railroad company had sold, forfeited, pledged, or traded off the mortgage made to it of the land in question ; that it was his intention to say that he had heard that the company had disposed in various ways of many of these mortgages, and not that he knew of the disposition of any specific one, or whether it had been disposed of at all or not ; that at the time it was not unusual for parties to inquire of the company whether some mortgage, describing it, was still held by them or not, and several such inquiries were made through witness's office at Portage City ; that the intention of his answer was simply to state an impression then current in regard to many of these mortgages ; that he was further represented, in said deposition, as saying that at the time of the sale he had been informed that parties in Milwaukee had purchased up large quantities of these mortgages, and *Lennan's* among the rest, and that forced payment was to be attempted ; that his intention in this answer, as in the former, was to convey a current impression, and not to say that he had definite knowledge in regard to any specific mortgage ; that, if he had known that *Lennan's* mortgage had been transferred, and that no steps had been taken to bring the Smith foreclosure suit to the notice of the owner, he would not have become the purchaser ; that, as he knew of no such transfer, it was his intention to be so understood. In reply to further cross-interrogatories, Mr. Munn stated that he did not know whether Mr. Condon was acting on behalf of *Lennan* when he advised witness to buy said land ; that he would not swear that he did not suppose at the time that said Condon was representing the interest of said *Lennan ;*

that as to witness's promise to Condon, to sell and convey the land to the person whom the latter might name, he could not say for whose benefit that promise was made; but that he would not swear that he did not then suppose that Condon took the promise from him for *Lennan's* benefit.

*Mr. Doty*, for the defense, testified that the first knowledge or intimation he ever had of plaintiff's claim to own the railroad mortgage was from the service of the summons in the suit to foreclose it, in January, 1866; that prior to his purchase of Munn, he never had any information or knowledge that the railroad company had disposed of said mortgage; that he supposed he was getting a clear, absolute title to the property, and Munn so represented to him; that the rent which had fallen due to him under his lease to *Lennan* had been expended, under the provisions of said lease, in making certain described improvements upon the place, to the value of $600 or $700; that witness had no knowledge of these improvements, except from the accounts rendered him by *Lennan*, on which they settled; that he had paid taxes on the place for 1865, 1866 and 1867, in all between $50 and $60.

Mr. *Lennan's* testimony for the defense, stated the same facts as to the settlement of the rent by improvements and repairs made by him; and also stated that he did not believe $1,500 could have been got for the place at the time of *Doty's* purchase. Other evidence was introduced, tending to show that the premises were not worth over from $1,000 to $1,500.

The court found, *inter alia*, that the note and mortgage of *Lennan* to the railroad company were owned by plaintiff at the time the Smith mortgage was foreclosed; that when Munn purchased upon that foreclosure sale, he "did not have knowledge that the plaintiff held or owned any mortgage thereon, and that he did not then, or at the time of receiving his deed, have knowledge or notice that the railroad company had ever ceased to be the owner of

its said mortgage, or that the holder thereof was not bound by said foreclosure proceedings ;" and that *Doty*, at the time of his purchase from Munn, had no knowledge or notice of any defect in Munn's title, or that the railroad company had ever ceased to be the owner or possessor of the mortgage made to it. The court held, therefore, that the plaintiff had no right of redemption against *Doty ;* and rendered judgment accordingly, from which the plaintiff appealed.

*David S. Ordway* and *E. Mariner*, for appellant, argued upon the evidence, 1. That Munn's purchase was clearly nothing but an arrangement for *Lennan's* benefit. *Williamson v. Brown*, 15 N. Y. 362 ; *Baker v. Bliss*, 39 id. 70. 2. That *Doty* was in no better position than Munn. The simple fact that Munn's title was liable to be redeemed from ; that the property was worth $2,000 or $3,000 ; that *Doty* was asked and paid only $100 for it, and that he made no inquiries,—show that he was not a *bona fide* purchaser within the meaning of the recording act. *De Witt v. Perkins*, 22 Wis. 473. 3. Upon what terms may we redeem ? (1) Without payment of the costs of the Smith foreclosure. *Benedict v. Gilman*, 4 Paige, 58 ; *Vroom v. Ditmas*, id. 526 ; *Gage v. Brewster*, 31 N. Y. 218. (2) Without paying costs to the defendant, but entitled ourselves to costs, the defense being unfair. *Slee v. Manhattan Co.*, 1 Paige, 81 ; *Henry v. Davis*, 7 Johns. Ch. 40 ; *Green v. Wescott*, 13 Wis. 609 ; *Gage v. Brewster*, 31 N. Y. 222 ; and cases cited under previous head. (3) Upon payment of necessary repairs and taxes, and such other just charges as are necessary to preserve the estate ; against which we are allowed rents, issues and profits. *Mickles v. Dillaye*, 17 N. Y. 84 ; *Moore v. Cable*, 1 Johns. Ch. 387 ; *Quin v. Brittain*, 1 Hoffm. 353 ; *Wetmore v. Roberts*, 10 How. Pr. 54 ; 2 Story's Eq. Jur. § 1,016 b. Where one in possession, having really only the rights of a mortgagee in possession, *believes himself to have an absolute title, in good faith*, and

so makes valuable permanent improvements, he is entitled to be paid for them (*Green v. Nixon*, 9 Wis. 539 ; *Mickles v. Dillaye*, 17 N. Y. 84) ; but otherwise he cannot thus burden the right of redemption. *Wetmore v. Roberts* and *Moore v. Cable*, above cited ; *Sandon v. Hooper*, 6 Beav. 246. Counsel further cited as to the question of notice of plaintiff's rights, *Haight v. Hayt*, 19 N. Y. 466 ; and as to the question of accounting and costs, *Gladding v. Warner*, 36 Vt. 54.

*I. Holmes* and *G. C. Prentiss*, for respondents, contended that, if either Munn or *Doty* was a purchaser in good faith, their deeds having been first recorded, the assignment of the mortgage to plaintiff was void as to them, not having been recorded. R. S., ch. 86, §§ 25, 35 ; *Vanderkemp v. Shelton*, 11 Paige, 28 ; 8 Wend. 620. They further contended, upon the evidence, that both Munn and *Doty* bought in good faith, without knowledge that the railroad company had assigned its mortgage ; that, if the facts were such as required of them further inquiry, still they were chargeable with knowledge of those facts, only, of which they would have obtained information by the exercise of proper diligence ; that such diligence would not have enabled them to ascertain to whom the mortgage had been transferred, since the complaint avers that the company had ceased to exist ; that, if information could, by any means, have been obtained as to the original transfer, that would not have shown who was then the owner of the mortgage, since it was assigned by such an instrument that it passed by mere delivery ; and that, even if the railroad company had been in existence, and had had an office where the original assignment would be noted, yet the most natural place for inquiry, and the only one where the law required parties foreclosing the prior mortgage to inquire, as to the ownership of the railroad mortgage, was at the office of the register of deeds ; that to hold otherwise would be to make it practically impossible for the owner of a first

mortgage to make a good foreclosure against one of these fugitive incumbrances. 2. Counsel contended that in case plaintiff were allowed to redeem, he should be required to pay (1) the full amount of the prior mortgage, with interest at the rate therein stipulated, and interest at seven per cent. upon each year's accruing interest since its date, and without any deduction for rents and profits, because neither Munn nor *Doty* had received any. (2) The increased value of the premises, by reason of the improvements which *Doty* had caused to be placed upon them, deducting the amount of stipulated rent with which these improvements had been in part paid for. R. S., ch. 141, §§ 30, 33 ; *Benedict v. Gilman,* 4 Paige, 58 ; *Green v. Dixon,* 9 Wis. 539 ; *Mickles v. Dillaye,* 17 N. Y. 80. (3) All taxes paid or caused to be paid by *Doty.* (4) The costs of this suit. *Benedict v. Gilman,* cited above ; *Slee v. Manhattan Co.,* 1 Paige, 48; Dissenting opinion of MULLIN, J., in *Gage v. Brewster,* 31 N. Y. 222.

PAINE, J. The evidence in this case is not materially different, upon the question whether either Munn or *Doty* was a *bona fide* purchaser, without notice of the plaintiff's mortgage, from what it was in the former action between the same parties, reported in the 22d Wis. p. 621. We there held that it clearly appeared that each had notice, and that the plaintiff had the right to redeem from the former mortgage sale under which their title accrued. We think this is equally clear now.

It is true, that in the present case it appears, that Munn had been induced to attempt to make an apparent qualification of his former testimony. But, if there is any qualification at all, it is apparent only, and not real. All that it amounts to is, that his former answers, to the effect that he had heard, at the time of his purchase, that the La Crosse Railroad Company had transferred large numbers of the railroad mortgages, and among them *Lennan's,* were not intended to mean that he had any actual knowl-

edge of the fact, or definite information of the actual transfer of this particular mortgage, but were founded merely on general current rumors. Notwithstanding all that he says upon this subject, it is still entirely apparent that he fully understood, at the time of his purchase, that this mortgage was outstanding somewhere, and was not owned by the La Crosse Company. And it is also equally apparent, from the mode in which he was applied to by Condon to take the title, from the trifling amount which he paid as compared with the value of the land; from his allowing *Lennan* to remain in possession during all the time he held the title, without calling for any account of the rents and profits; from his paying no attention to the taxes, and from his finally disposing of it to *Doty* at *Lennan's* suggestion for $100, which, with what he had already received from Condon, repaid him for his advance, — that he never intended to acquire the title to the land for his own benefit, beyond a security for what he advanced; and also, that, although he may have been able to swear truly that he had no actual knowledge of any ulterior objects on the part of *Lennan*, or Condon acting for him, still he did have that knowledge which every intelligent man gains by inference from obvious facts presented to him, that they had some object, to accomplish which they wished him to take the title as he did, without asking any questions and remaining purposely as ignorant as possible, and that in all probability that object was in some way to cut off this very mortgage, which he knew to be outstanding. He consented to act in that capacity, designing only to get his money back. And when he was about removing from Portage City, *Mr. Doty* was selected to act as his successor. Mr. Munn sought out *Lennan* and told him he wanted the money, and was going to sell the land, "*but preferred making the sale to some party that was friendly with him.*" This phrase is pregnant with meaning. It would fully

reveal the real nature of the transaction, if it had not been sufficiently obvious without it.

Mr. Munn also says : "I conveyed the land to *Baron S. Doty* at his own request, and because *Mr. Lennan* had previously told me that he had no objection to my making a sale to *Mr. Doty.*"

It is true, *Mr. Doty* swears that he had no conversation with *Lennan* before purchasing of Munn. But he does not swear that he had no conversation with any one acting in behalf of *Lennan.* And it is extremely probable that it was deemed advisable that the negotiations, such as they were, with *Doty* should be carried on, as they were originally with Munn, through the intervention of a third person. Either this must have been the case, or else the relations between *Lennan* and *Doty*, or Munn and *Doty*, were such that it was felt with entire confidence that the title might be conveyed to him for a nominal consideration, and that he could be relied on, without asking any questions, to fill Munn's place. It is little less than preposterous to suppose that he believed himself to be acquiring for his own benefit the title to a farm worth from $2,000 to $3,000 for $100. He knew that Munn's title had been acquired several years before, and that *Lennan*, the original owner, had remained in possession all the time. An offer under such circumstances by Munn to sell him such a farm for $100, although it might not in itself have apprised him of the exact nature of the objects which the parties were trying to accomplish, would yet be sufficient to inform him so distinctly that there was some ulterior object in view, somebody's rights or interests attempted to be sacrificed, as to put him upon the strictest inquiry. It is not necessary, in order to charge a purchaser with bad faith, that he should have definite knowledge or notice of the exact character and condition of the right which he attempts to defeat. If the circumstances are such

as to inform him loudly that some wrong is sought to be perpetrated, he cannot blindly shut his eyes, and then come into court in the character of a *bona fide* purchaser.

In *De Witt v. Perkins*, 22 Wis. 473, we held that one who purchased a note for $300, shortly before its maturity, against a solvent maker, for the sum of $5.00, was not a *bona fide* purchaser. That circumstance alone was sufficient to put him on inquiry; and charge him with bad faith if he neglected to make it. The decision is entirely applicable to the purchase by *Doty* in this case, if nothing were considered but the mere amount of the consideration which he paid. But in addition to that we have the fact that he knew of the existence of this railroad mortgage; that he must have known that, at the time the first mortgage was foreclosed, it no longer remained in the hands of the La Crosse Company, because Munn swears that at the time he purchased, this company was generally understood to be insolvent, and that, in raising these mortgages, it was openly represented by the company that they were wanted to use as a basis of credit upon which to raise money, and that rumors that this and others had been transferred were then current. It was utterly improbable, therefore, that at the time of the first foreclosure sale this mortgage remained in the hands of that company, so that, although *Doty* might safely swear that he had no knowledge or definite information of the transfer of this particular mortgage, he must have had perfect knowledge that in all probability, this, as well as all others of the same class, had been transferred. So that the facts not only imperatively put him on inquiry, but also directed his attention very distinctly to the precise subject-matter of that inquiry. And, indeed, without making any further inquiry at all, he had sufficient general knowledge to enable any man of ordinary intelligence to draw a reasonably certain inference that the object of the transaction, in which he

was sought to be used, was in some way to defeat this mortgage, which he had every reason to believe was outstanding somewhere. His subsequent conduct has been in entire harmony with the conclusions indicated sufficiently by the original facts. It is true, he went through the formality of executing a lease to *Lennan ;* but the entire rent, since that, has been paid by improvements made by *Lennan* on the property for his own convenience. And *Doty* himself swears that he had no knowledge as to the $600 or $700 worth of improvements and repairs made by *Lennan,* except from *Lennan's* account, according to which they settled.

If, upon such facts as these, either Munn or *Doty* could come into court and uphold their title as against this mortgage, which they both knew to exist, and had every reason to believe was outstanding, as *bona fide* purchasers, it would seem useless ever to attempt to make out a case of bad faith.

The plaintiff has a right to redeem, and to have an account stated upon the principles applicable to such a case. And we do not feel called upon to anticipate at this time all the questions that may arise in respect to such account, as the court below has not yet passed upon them.

The judgment must be reversed, and the cause remanded for further proceedings in accordance with this opinion.

*By the Court.*—So ordered.

Dixon, C. J., did not take part in the decision of the above cause.