VOL. 117, APRIL TERM, 1893. 261

The Conn. Mutual Life Ins. Co. v. Smith.

THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY, *Appellant*, v. SMITH, *Appellant.*

Division Two, June 27, 1893.

1. **Corporation**: CONVEYANCE: COLLATERAL ATTACK. A consummated conveyance of land to a corporation can be collaterally assailed only by the state.

2. ———: ———:. ———. The only exception to the rule against such collateral assault by a private suitor is where the conveyance is authorized by express legislative permission.

3. ———: ———: PRESUMPTION. A proper and legitimate purpose will be presumed on the part of a corporation accepting a conveyance of land, in the absence of any evidence to the contrary.

4. **Land**: FRAUD: ASSIGNMENT OF RIGHT OF ACTION. One possessed of an interest in land and who has been defrauded of it may maintain a suit to recover the same and such right of action is transferable.

5. ———: ———: NOTICE. Notice of a conveyance by which another has been defrauded of his land does not mean positive information brought directly home to the person sought to be charged with the notice; any facts which will put a prudent man on inquiry constitute notice.

6. ———: ———: ———. Actual notice may be inferred from circumstances and by reasonable inferences therefrom.

7. ———: ———: ———. The purchase of property worth $15,000 for $100 is in itself evidence of notice of the grantor's fraudulent title.

8. **Fraud**: BONA FIDE PURCHASER: BURDEN OF PROOF. The burden of proving a *bona fide* purchase from a fraudulent grantor rests on the defendant pleading it.

9. ———: FAILURE TO DENY CHARGE: PRESUMPTION. Failure of one charged with fraud to appear at the trial and testify in denial of the charge raises a presumption against him.

10. **Land**: FRAUD: FIDUCIARY RELATION. Where one occupies a fiduciary relation towards the owner of land, all gains acquired by him by means of his position, whether through conveyance to him of an adverse interest or otherwise, belong to such owner.

The Conn. Mutual Life Ins. Co. v. Smith.

11. ———: TRUSTS: LIMITATION. The ten years' bar of the statute of limitations applies to suits seeking to enforce trusts in real estate.

12. **Demurrer**: RES JUDICATA. A final judgment on a demurrer to a petition which goes to the merits makes the whole matter *res judicata*.

13. **Land**: CLOUD ON TITLE: EQUITABLE TITLE: TRUST. One may maintain a suit to remove a cloud on title to land though the defendant is in possession, where the plaintiff has merely an equitable title and it is sought to divest the title and declare a trust.

14. **Pleading**: PETITION: AMENDMENT. It is proper to permit before final judgment a petition to be amended to conform to the facts proved.

15. ———: ANSWER: AMENDMENT. It is not error three days after the entry of final judgment to refuse permission to file an amended answer.

16. **Equity**: DIVESTING FRAUDULENT TITLE: REIMBURSEMENT OF PURCHASE MONEY. A court of equity, when divesting a fraudulent title to land out of a defendant, will not reimburse him for the purchase money, where it was paid by defendant of his own wrong and in furtherance of an actual fraud.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

REVERSED AND REMANDED.

By this equitable proceeding, instituted March 4, 1886, the plaintiff sought relief in equity as follows: To establish as against the defendant a trust in an undivided one-fifteenth of a tract of land in the city of St. Louis, known as United States survey number 2500; the cancellation of certain deeds obtained as alleged by defendant of one Darby through fraud and a gross breach of trust, while acting as the trusted agent of Mrs. Washington, from whom plaintiff claims through mesne conveyances to Fisher & Wade and from the latter to plaintiff; to declare defendant a trustee as to such deeds and certain lands and money acquired by him by means of said deeds, compromises

and exchanges effected by him by reason thereof; that defendant be divested of all title in the lands thus acquired, and the same be vested in the plaintiff; that an accounting be had as to all lands and moneys thus received by defendant, and the petition concludes with a prayer for other and further relief.

To the allegations of the petition were interposed the denials of the answer, and other allegations to the effect that plaintiff had no capacity to acquire any interest in the properties described in the petition; that such supposed acquisition was *ultra vires* the charter powers of plaintiff; and that defendant acquired the title of Darby for full value and without notice of any fraud or breach of trust on the part of Darby. In conclusion the answer sets up the five and the ten years' bars of the statute.

A general reply was filed.

The evidence in this cause though very voluminous is not conflicting. It was for the most part offered by plaintiff and was chiefly documentary. That offered by defendant was largely devoted to showing that plaintiff's acquisition of title from Wade was *ultra vires*.

Defendant did not testify, nor call any witnesses in his behalf. His testimony in other causes was, however, used against him by plaintiff. At the close of the evidence the court entered an interlocutory decree in plaintiff's favor, which was in substance the following: The court found that defendant, when he took Darby's deed of October 25, 1880, held a relation of trust and confidence to Mrs. Washington as to her interest in United States survey 2500, and the actions of ejectment then being prosecuted for her by Morrison, and defendant as an associate and assistant of him, as set out in the petition, and that, by reason of his so holding same, whatever title in the particular eleven

parcels firstly described in the petition, was acquired by him, by virtue of said deed, was taken by him in trust for her, and thereafter was held by him as a trustee for her and the respective successive assignees of her rights in same, namely, Fisher, Wade and plaintiff, under the several deeds of 1881 and 1883 mentioned, and on the repayment to him by plaintiff of the $100 he had paid Darby, with interest, all the title so acquired by him ought to be divested out of him, and vested in plaintiff; that plaintiff by virtue of the deeds mentioned in the petition made to Mrs. Washington, by divers of the defendants in said actions of ejectment pursuant to compromises, of the eight parcels first particularly described therein, and of the deeds therein mentioned made to Fisher, pursuant to compromise of others of said actions, of the three other parcels described therein, and by virtue of the deeds of February 5, 1881, April 11, 1881, and July 28, 1883, and of the interlocutory and final decrees in the suit in partition begun on April 14, 1881, by Mary Jewett v. Hammond *et al.*, cause number 56054, mentioned in the petition, acquired the title to an undivided one-fifteenth of said eleven parcels, and the whole of the two parcels of lot 49 of Peter Lindell's second addition set apart by the commissioners in partition in said cause 56054 as in controversy between the defendant and Robert B. Wade; and all the rights in law or equity of Mrs. Washington, Fisher and Wade therein; that the claim of title of defendant to a one-fifteenth of said eleven parcels, and to the whole of said two parcels of said lot 49, so set apart as in controversy under said deeds to and by Darby, was a cloud upon plaintiff's title to said two parcels of lot 49, and said undivided one-fifteenth of said eleven parcels, and that plaintiff was entitled to relief as prayed in its petition in respect of its title to said one-fifteenth of said eleven

parcels, and the whole of said two parcels so set apart; and accordingly then decreed that defendant at the time of the commencement of said suit of Jewett *v.* Hammond *et al.*, on April 14, 1881, and the making of the interlocutory decree therein, on October 20, 1881, held whatever title was acquired by him by virtue of said deeds of June 20, 1873, of Mary A. Washington to John F. Darby, and of October 25, 1880, of Darby to him, defendant, in or to said undivided one-fifteenth of said eleven parcels of said survey (describing them as in the petition) in trust for Robert B. Wade, and that since July 28, 1883, had held whatever title he by virtue of said two deeds of June 20, 1873, and October 25, 1880, acquired in said undivided one-fifteenth, or that he now has by virtue thereof, or of the interlocutory and final decrees in said cause in partition, of Mary Jewett *v.* Hammond and others, in said two parcels of said lot number 49, by said commissioners set apart to him or said Wade, in trust for plaintiff; and that in case plaintiff by April 13, 1891, paid into the hands of the clerk for defendant's use $100, with interest from October 25, 1880, in all $164, he, defendant, should, by April 20, 1891, deliver to the clerk for plaintiff's use his deed releasing to plaintiff all the title and interest that he acquired by virtue of said two deeds in said eleven parcels, or that he then held by virtue of them or said decrees in said cause 56054 in said two parcels of lot number 49 so set apart by said commissioners, and that, in case of his failure so to deliver such deed by said last-named day, then all the title acquired, or held by him, should be divested out of him, and vested in plaintiff, and he should be forever enjoined from setting up or claiming any title in said one-fifteenth in said eleven parcels, or any part of said two parcels so set apart under said two deeds of 1873

and 1880, and that the further disposition of the cause should be adjourned till April 30, 1891.

And on April 30, 1891, a final decree was entered, in which, it being shown to the court that plaintiff had before April 13, 1891, paid $164 into the clerk's hands for defendant's use, and that defendant had not delivered to him any deed for plaintiff, it was then decreed that all the judgments and directions of the decree of April 7, 1891, should be confirmed, and made firm and effectual forever, and that all the title that defendant by virtue of the two deeds of June 20, 1873, and October 25, 1880, acquired in said one-fifteenth of said eleven parcels, or then by virtue of said deeds, or the decrees made in said cause 56054, held in said two parcels of lot 49 set apart to him or Robert B. Wade as in controversy, etc., should be divested out of him, and be vested in plaintiff, and that he be forever enjoined from setting up such title, etc., and that plaintiff recover of him its costs of suit, etc. At the time of entering the decree, leave was given plaintiff to amend its petition to conform to the facts proven. Defendant excepted to this permission to amend, and three days thereafter moved for leave to amend his answer, which was denied.

From this decree, after necessary motions, both parties appealed: the plaintiff, because a trust was not declared as to other tracts of land, etc., described in the petition; the defendant, because any trust whatever in the land was declared in plaintiff's favor.

Compressing the vast mass of testimony into something like a readable compass, the evidence, so far as necessary to quote it, is, in substance, as follows: Mrs. Mary A. Washington, daughter and only surviving child of Samuel Hammond, was entitled to one-fifth of United States survey 2500. She resided in Georgia. Other heirs, descendants of Hammond,

were entitled to the other four-fifths of that survey; some of them resided in Georgia, South Carolina, Alabama and Arkansas. In June, 1873, the whole of such survey, then worth $2,500 per acre, was in the actual adverse possession of the heirs of Peter Lindell or their grantors, and a large portion of it had been subdivided by them into lots and streets, called Peter Lindell's second addition to the city of St. Louis, and had been partitioned among such heirs, etc., in severalty. In May, 1873, John F. Darby, an attorney at St. Louis, wrote Mrs. Washington at Macon, Georgia, proposing to bring suit, as her attorney, to recover her interest in survey 2500, on the terms of having half of what he could recover, and nothing if he failed. In reply, she, on June 1, 1873, wrote accepting his offer, her letter reaching him on June 4.

Afterwards, on June 14, he again wrote her two letters dated June 13 and 14, 1873, and sent her enclosed with them duplicate drafts of a contract for his employment on the terms previously agreed to, and also a draft of a quitclaim deed conveying to him for $100 and "other good and valuable considerations," recited to have been paid, an undivided half of said survey 2500, and other lands, which, as well as one copy of the contract, he requested her to execute and return to him. Respecting the deed, its effect and what he intended doing with it, he said to her in the letter of the fourteenth, as follows: "The deed being quitclaim will, of course, be of no value or valid until I shall have gained the whole lands, and which I will have to sue for the whole in her name, and, therefore, carries nothing till the suits are gained; and I will, of course, keep the quitclaim now sent, in my possession till after the recovery." And in that of the thirteenth he also said: "This deed I will of course keep in my

private papers till we shall have gained the suits, if we ever gain them.''

As requested in these letters, and on the strength of these statements in them, Mrs. Washington executed the deed and returned it, and one copy of the contract, also signed by her, to Darby. No money was paid her and there was no consideration for the deed, except the agreement with Darby as to suing, and its object was only to secure him his fee in case he recovered the land. The deed was dated June 20, 1873, and was sent to Darby about the time of its date.

Darby never brought any suit nor recovered any land. During the rest of the year, 1873, he wrote his client many letters informing her of his making some investigations of the law and facts bearing on her rights, and finally, on December 30, wrote her plainly that her claim was fully barred by limitation; that he did not wish to sue with no prospect of recovery; and if she could get anyone else to bring the suits to do so.

In the following spring upon her writing him to turn over her papers to Mr. Yeatman, he, in a letter of March 12, 1874, wrote her that he had been too busy to look them up, but that he would do so, and deliver them to her order. Two years later, namely in June, 1876, upon her coming to St. Louis and calling at his office for her papers and the deed she had sent him, he told her that he did not consider they were of any value; that he had destroyed the deed when he found he could recover nothing for her; that he was busy at the time, but would look up what papers he had and send them to her at the house where she was stopping in St. Louis. In the afternoon of the same day a package of old letters and memoranda was delivered at that house for her, together with a note from him of date twenty-eighth of June, 1876, saying that he sent her her papers and old letters as that morning requested;

VOL. 117, APRIL TERM, 1893.            269

The Conn. Mutual Life Ins. Co. v. Smith.

that the deed he had destroyed as worthless when he found he could recover nothing for her, and that she could employ other counsel; "had destroyed all deeds and agreements that had passed between them."

In the meantime after his letter of December 30, 1873, Mrs. Washington, accepting his offer to give up the contract, upon being approached by defendant Smith and James L. D. Morrison in the spring of 1874, had entered into new arrangements with them for the recovery of her interests. Bearing upon this, as to how it came about, what the relations of defendant and Morrison to each other were, and what their several relations to Mrs. Washington, the evidence showed facts as follows:

In December, 1873, or January, 1874, defendant, who was residing at St. Louis, by investigations made by himself discovered defects in the record title of the Lindell heirs to survey 2500, which he thought, if taken advantage of, would make the title good in the heirs of Samuel Hammond; and he thereupon conceived the idea of hunting up the letter, and making some arrangements with them for the enforcement of their rights.

Being himself without means to carry on the enterprise, he proposed to James L. D. Morrison, an attorney of St. Louis, supposed to have money, that he was willing to risk in a speculation of that sort, that he (defendant) should look up the Hammonds and buy from them their interests, or make such arrangements with them as should be necessary for the assertion of their titles, Morrison to furnish the money necessary for so doing and the interest acquired to be held for their joint account, each to pay half of the legal fees and expenses, and to share in what was recovered equally.

Morrison accepted the proposition, and Smith, furnished with money by him, went to Georgia and other southern states to hunt up the heirs and make such terms as he could, for "joint account." This was between January and March, 1874, and resulted in the obtaining by Smith of deeds and contracts with certain of the heirs by which some forty-five to sixty per cent. of the whole title was put in his name for "joint account."

Among the rest he found Mrs. Washington, and visited her several times at her home in Macon. He first proposed to buy her interest, but, she refusing to sell, he then agreed that if she would convey him two-thirds he would prosecute suits for her for the other third free of costs to her, and that Morrison would assume the liability of all such costs. A paper was drawn up about February 26, 1874, expressing this, and at the same time conveying to him the two-thirds interest, it being at once a contract and a conveyance. This was signed but was left with her until Morrison should write her agreeing to be bound to her for the costs of the suits. By a separate paper, made also on February 26, Smith further agreed to pay at the termination of the suits to be brought, $7,000 out of his "individual interest," in what was recovered in addition to the part reserved to her. On March 12, Morrison wrote her assuming liability for the costs, and later the contract was sent to him or Smith.

After Smith's return from the south, and his thus obtaining deeds and contracts from the heirs, on Morrison's suggestion that as an attorney he would do the legal work, it was agreed between them that their respective shares in the profits and losses of the venture should be changed, and instead of being equal should be three-fifths for Morrison and two-fifths for Smith. This was agreed on about the latter part of

March, and to carry it out Smith then deeded Morrison three-fifths of the title he then had. Up to this time the titles had, at Morrison's desire, been taken in Smith's name. Soon afterwards, however, about the middle of April, Morrison required that this should be changed; that the original contracts should be cancelled, the titles reconveyed to the heirs, and new deeds to him alone be taken from them, leaving Smith out, so far as deeds were concerned; but the titles taken to be as between them for their joint account in the proportions of three-fifths and two-fifths. as previously agreed. To effect this, Morrison wrote letters to Mrs. Washington and the other heirs, and finally, about May 16, he and Smith went together to the south to see her and then and there brought it about.

In the making of the change of contract with Mrs. Washington, Morrison and Smith visited her together at her home in Macon, and on May 16, 1874, upon surrender of the agreement of February 26, between her and Smith, for the bringing of suits, and his reconveying to her the title to the two-thirds of her interest and Morrison giving her a bond of $10,000, reciting her employment of him to bring suits for her interest in two-thirds thereof, and binding him to prosecute such suits to an end free of costs to her; and on Smith's also endorsing on his other agreement of February 26, 1874, with reference to the payment of $7,000 to her out of his "individual interest in the recovery," that it should apply to the arrangement that day made by her with Morrison, to which he then consented, the same as to the former agreement between him and her, which was that day given up and cancelled, she made to Morrison her deed conveying him two-thirds of her interest.

On the day following the execution of her deed, Morrison informed her by a letter written at Macon,

Georgia, that Smith was to have two-fifths of the two-thirds she had deeded him, and directed him to pay her $8,000 out of his share if recovered, and that he would retain that sum out of his interest when he should deed to him.

Prior to this change of the deeds from Morrison's name to Smith's, the latter had consulted with Daniel T. Jewett, an attorney at St. Louis, about the litigation for survey 2500 he contemplated bringing, and had agreed with him that he would employ him therein, and, when the change was determined on, it was with the understanding between Morrison and Smith that Morrison should by and by deed Smith two-fifths of what interest he got, and that Smith out of such two-fifths should employ Jewett as attorney in the suits.

After this change no deed was made by Morrison to Smith until August 6, 1874. In June, however, Morrison, Smith and Jewett, the latter having before then come to an agreement with Smith, by which he would act as attorney in the suits to be brought, for a fee of a third part of the two-fifths interest that was to be deeded to Smith by Morrison, and free of all expense to Morrison—began in the circuit court at St. Louis twenty-nine suits in ejectment in the name of Mrs. Washington and all the other Hammond heirs and of Morrison as plaintiffs against sundry several defendants, among whom were John, Robert and Levin Baker, Mrs. Coleman, Mrs. Patchin, Mrs. Gordon, Mrs. Collins and their husbands, Jesse G. Lindell, Albert Lindell, Logan D. Dameron, Charles H. Peck, Frank Harris, Thos. L. Currie, trustee, Hiram W. Leffingwell, and several others. The petition in each of them was for the whole of survey 2500, and was in the ordinary form of a petition in ejectment. They were on printed blanks that had been prepared by

Smith and Jewett, and the name of all the defendants in them were written therein in Smith's hand-writing. The signatures thereto were printed. Morrison did not appear as attorney. His signature was "Jas. L. D. Morrison, *pro se.*" The signatures thereto of those, appearing as attorneys were of D. T. Jewett, and S. N. Holliday. In the preparation and filing of these, Smith, Jewett and Morrison acted and consulted together, but Jewett and Smith did the active part. A copy of this form of petition was sent by Morrison to Mrs. Washington on June 18, 1874, he advising her that the suits had been begun.

On August 6, 1874, Morrison, by deed of that date, conveyed to Smith the two-fifths of the interest he had acquired under the several deeds of the Hammond heirs, Mrs. Washington included, and in November following, Smith, under date of November 5th, deeded to Jewett one-third of the interest Morrison had deeded him. Morrison's deed to Smith was kept off the record till March 10, 1884, and that of Smith to Jewett till December 1, 1880. In that to Smith it was stated that the two-fifths conveyed was subject to certain conditions and incumbrances, namely: "First, the said two-fifths if recovered in the actions of ejectment now pending for its recovery in the name of Jas. L. D. Morrison, in the circuit court of St. Louis county, is chargeable for the payment to Mary A. Washington of the sum of $7,000, which said Smith covenanted to pay her and said Morrison agreed to see paid; * * * and with two-fifths of any and all expenses, fees and costs to be incurred in the prosecution of said suits in ejectment for the recovery of said land, except the fees to J. L. D. Morrison and D. T. Jewett, attorneys, the said Smith having arranged with said Jewett that his services are to be rendered free of

all expense to said Morrison, as compensation for said Morrison's personal services." In Smith's deed to Jewett of November 5, 1874, the conveyance of one-third of Smith's interest was made subject to all the covenants, and the payment of one-third of all expenses and charges as specified in the prior deed of Morrison to him.

After the bringing of these suits in 1874 they were prosecuted by Morrison, Smith and Jewett with varying success until 1881, and later; a number of them in that time being tried and determined, and others dismissed pursuant to compromises made.

Jewett, appearing as attorney for the plaintiffs, took part in and was present at the trial of all of these cases. In the first trials Morrison also appeared and took an active part; but after a time, owing to disagreements between him, and Smith and Jewett, he retired from the active management of them, and Jewett took chief control. This he did with Morrison's consent and at Smith's request. The time when Jewett and Smith insisted on his being so allowed to manage the cases was about May, 1879. Smith also took an active part personally in the conduct of the litigation. By arrangements between him and Jewett he took charge of the details of the cases, hunting up the titles, finding who were in possession and to be made defendants, having blanks for the petitions printed, and filling them up, preparing abstracts of titles for use at the trials, sorting papers, helping to keep them and furnishing them to Jewett as they were wanted, and attending at all the trials and making memoranda thereat. He also in December, 1874, went to Augusta, Georgia, and in person took on behalf of the plaintiffs in the *Coleman case* depositions of several witnesses to prove the death of Hammond, and who

his heirs were, and other facts essential for plaintiffs to prove.

His business from 1874 to 1881 was mainly in prosecuting these cases and others, and in land titles, and during that period he and Jewett had their office together most if not all the time. He attended at, and took part in, most of the consultations between Jewett and Morrison, and no compromise or dismissal of any case was made without his consent. He also assisted Jewett in making up bills of exceptions taken in the cases; and the memoranda of dismissals, and the remitters filed in those compromised were generally written by him. He assisted in negotiating compromises, and, after they were agreed on, computed the shares in the land to be deeded to the different plaintiffs, and drew the deeds made by both sides in carrying them out, including deeds to and by Mrs. Washington.

In three of the cases in which judgments were recovered for the plaintiff no appeals were taken, and so executions were sued out and plaintiffs put in possession. Under these the plaintiffs, Mrs. Washington included, were put in possession of lot 60, and parts of lots 52 and 56 containing in all about nineteen acres. They were put in possession of all these parcels as early as June, 1880. Jewett attended to the suing out of the writs and taking possession, and he and Smith were still in possession of the parcels, when this case was tried.

Prior to October, 1880, there were compromises of several of the cases. These were made by a division of certain parcels of the land between the contending parties, upon the basis of half in value to each. To carry them out, the plaintiffs quitclaimed to the defendants or their grantees, all their interest in a certain parcel by deeds duly made, and left them in pos-

session, dismissing their suits as against them; and the defendants or their grantees quitclaimed to the several plaintiffs undivided interests, aggregating altogether the entirety in another parcel, and surrendered to them the possession of such parcel. In each of them the deeds made to the plaintiffs were for fractional interests of the same amount as they were respectively claiming, or were entitled to have therein under the Hammond title.

During the progress of the litigation from June, 1874, to December, 1879, defendant wrote Mrs. Washington many letters from time to time, in which he reported to her what was being done by him and Morrison for her in connection with the suits, and spoke of the judgments obtained as having been obtained by them, and of the lands gotten possession of as those of which they had recovered possession for the Hammond heirs. And in November, 1879, he filed in the probate court a motion in the matter of the estate of Samuel Hammond, in which he described himself as the agent of the heirs of Samuel Hammond, and stated that said heirs had an attorney in St. Louis, who was prosecuting suits for the recovery of their land. This was signed and sworn to by him, and also countersigned, "D. T. Jewett, attorney for Hammond heirs and others interested." In the same period he also received letters from her, in which she recognized him as acting jointly with Morrison in the conduct of the suits, and indicated that she relied on him to bring them to a successful end. Letters were also written to her by Morrison from time to time up to February 21, 1881, advising her of what was being done, and indicating that he and Smith were acting in concert in the conduct of the suits for her.

In December, 1879, Jewett, as attorney for one of the Hammond heirs, Mrs. Webb, had brought suit for

partition of all the lands theretofore gained by compromises. Mrs. Washington, Morrison and others were made parties defendant. The petition was written by defendant, and the interests of the different parties stated; that of Mrs. Washington to be one-fifteenth. Defendant drew the interlocutory decree in the usual form, which was entered October 13, 1880. On October 26th, and before final decree, defendant appeared by his attorney, Denison, and moved to set aside the interlocutory decree, on the ground that a conveyance had been put to record which would vary the proportion to him and other parties to the suit. This motion was granted, and the suit dismissed December 15, 1880.

A few days before the filing of his motion to set aside the decree in this case of *Webb v. Morrison*, Smith, who knew and was on friendly terms with John F. Darby, and had been for some years before, met him late one Saturday afternoon standing at a street corner, about to go home. Darby was under the influence of liquor. Smith began conversation with him, and Darby said: "Smith, how are you getting on with the Hammond matter?" Smith replied: "Very well." Darby then said: "Smith, how are you getting along with Mrs. Washington?" "Very well," said Smith, "I have got a deed from Mrs. Washington," said Darby. "What, Mr. Darby?" said Smith. "I have got a deed from Mrs. Washington, and I will give it to you, Smith," Darby then said. Upon Smith inquiring when it was made, and proposing to go down with him and get it, Darby replied that it was made some time ago, but he would not go that afternoon; that he was going home. This was on October 23d. On Monday following, October 25th, Smith met Darby again in the court house, and, after some talk, said he would go down with him to his office, and did

so. Arrived there, he said to him: "Mr. Darby, where is that Washington deed?" "Eh!" said Darby. "Where is that Washington deed that you promised to give me?" said Smith. "I won't give it to you," Darby replied. "Well," said Smith, "but you said you would on Saturday night, Mr. Darby." "Well," said Darby again, "I won't give it to you."

On Smith's then asking to see it, Darby produced the deed, and being asked what he was going to do with it, said he did not know, but that he thought he (Smith) could make something out of it, and that they would divide what he made. To this, however, Smith objected, saying "that it would not do," but suggested: "Suppose you sell it to me?" Darby said he would, but, being asked what he would sell it for, said he did not know, and asked what Smith would give. Smith declining to say, he finally said he would sell, but if he did so, Smith must give him part of whatever he made out of it; and, on his agreeing to that, he then said he would sell for $100, and make him a deed. Smith agreed to this, and told him to draw up the deed, and he would go out and get the $100. He accordingly went out, got the $100 in bills, and paid it over, and Darby then went before a notary and acknowledged the deed, and delivered it to him.

This is the account of the matter as given by Smith. From the original deeds, however, it seems that the paper signed and acknowledged by Darby on October 25th, was an assignment to Smith of Mrs. Washington's deed of June, 1873, to him, which was endorsed on it by him and acknowledged on that day, and that the deed of October 25th, from him to Smith, which was a quitclaim of all of Darby's interest in survey 2500 and other lands, was not acknowledged until October 27th. The deed of Mrs. Washington to Darby and the endorsed assignment of it to him, Smith put of record on

October 25th. That of Darby to him he recorded October 27th. Contemporaneously with Darby's assignment and delivery to Smith on October 25th, 1880, of the deed of June, 1873, he also assigned to him his copy of the agreement with him and Mrs. Washington of June 14, 1873, by which he had undertaken to recover her interest for her. The terms of that contract and Darby's abandonment of it, were already known to him at that time, Mrs. Washington having told him of them in 1874.

In getting from Darby and putting on record this deed, Smith did not consult with or inform Mrs. Washington. Nor did he advise with Jewett, or let him know anything about it, and Jewett in fact knew nothing of its existence until after it was recorded.

Following the purchase of Darby's title under the deed of June 20, 1873, and the recording of it and his deed of October 25, 1880, Smith began to set up claims to the one-fifteenth interest formerly recognized by him as Mrs. Washington's. He made such claim as to the one-fifteenth of the eight parcels of which Morrison and he with the Hammond heirs (including her) had already gotten possession, through the five compromises with Baker, Patchin, Coleman, Peck and Davis above mentioned, as also to the one-fifteenth of all the rest of the survey yet remaining uncompromised and in the possession of defendants in the suits. His claim to the one-fifteenth in the compromised lands he formally asserted by a suit brought by him in the circuit court against her on February 11, 1881, being case number 55597. By that, which was a bill in equity, he sought to have her title to half of an undivided one-fifteenth of each of seven of said eight parcels divested out of her and vested in him. His claim as so set up was defeated in the circuit court and court of appeals, and prior

to October, 1882, had been taken to this court.    (*Smith v. Washington*, 11 Mo. App. 519; s. c., 88 Mo. 476.) His claim to the one-fifteenth in the uncompromised land he formally asserted on March 5, 1881, by the filing of motions in twelve of the cases then still pending to have himself substituted as plaintiff in the place of Mrs. Washington, all of whose interest in the land in suit he averred had been acquired by him.

Other suits and compromises were conducted in a similar way and on similar bases with those already mentioned; it is unnecessary to set them forth at large. In February, 1881, Mrs. Washington conveyed her entire interest whether by inheritance, compromise, etc., to Fisher, for $4,500, who in March, 1881, conveyed the same to Wade for $5,000, who subsequently conveyed to plaintiff.

*John W. Dryden* and *Joseph Dobyns* for plaintiff appellant.

(1) The title acquired by Darby under Mrs. Washington's deed of June 20, 1873, was held by him on October 25, 1880, only in trust for her.    *First.* Because in its origin it was obtained by fraud, both actual and constructive; being the result (*a*) of a contract negotiated by him with her while her attorney, for a part of the subject-matter of the litigation which she had employed him to conduct for her; and (*b*) of false representations as to the effect of her said deed made by him to her in order to induce her to sign it.    *Wood v. Downes*, 18 Vesey, 125; *Uppington v. Bullen*, 2 Dr. & War. 184; *Holman v. Loynes*, 4 De G., M. & G. 275; *Walsmley v. Booth*, 2 Atk. 27; Weeks on Attorneys, sec. 363 [2 Ed.], p. 734; 2 Pomeroy, Equity Jurisprudence [1 Ed.], sec. 960, p. 488 and sec. 1055, p. 630; *Berrien v. McLane*, Hoffm. Ch. Rep. 424; *Mott v.*

*Harrington,* 12 Vt. 204; *West v. Raymond,* 21 Ind. 305; *Brown v. Bulkley,* 14 N. J. Eq. 451; *Griffith v. Townsley,* 69 Mo. 13; *Summers v. Coleman,* 80 Mo. 489. *Second.* Because the deed being made originally only to secure to him the right to have half of the land whenever he should have performed his contract, he could not in equity claim anything under it after he failed to perform, and abandoned the contract, and especially after he and she mutually agreed to rescind it. It was grossly unconscientious to so claim. He was bound to reconvey. *Uppington v. Bullen,* 2 Dr. & War. 184; 2 Pomeroy, Equity Jurisprudence [1 Ed.], sec. 1053, p. 628; 1 Story's Equity Jurisprudence [12 Ed.], sec. 705, p. 689; *Smith v. Washington,* 88 Mo. 477; *Rose v. Bates,* 12 Mo. 30; *Groves' Heirs v. Fulsome,* 16 Mo. 543; *Peacock v. Nelson,* 50 Mo. 256; *Damschroeder v. Thias,* 51 Mo. 103; *Washington v. Collins,* 13 Mo. App. 1; *Baier v. Berberich,* 6 Mo. App. 540. (2) Smith took Darby's title with notice of the trust and was not a *bona fide* purchaser for value. 2 Pomeroy on Equity Jurisprudence [1 Ed.], secs. 597, 598 p. 26; *Major v. Bukley,* 51 Mo. 227; *Eck v. Hatcher,* 58 Mo. 235; *Roberts v. Mosely,* 64 Mo. 511; *Shradski v. Albright,* 93 Mo. 42; *Merrett v. Poulter,* 96 Mo. 237. (3) The promise to give Darby half of what he could make out of the deed was not a payment of value. It was only going into partnership with him in a law suit. He was out nothing by it. *Lionberger v. Baker,* 88 Mo. 454; *Fisher v. Lewis,* 69 Mo. 632; 2 Pomeroy on Equity Jurisprudence [1 Ed.], p. 206, sec. 747, note 2. (4) Smith when he bought Darby's title held such a fiduciary relation to Mrs. Washington, that he could not claim the benefit of the purchase for himself, but was bound to take it wholly in trust for her. Hence, even if Darby before that had held his title free of any trust, yet Smith thereafter held it subject to one in her

favor.   The rule which forbids a trustee from buying a title adverse to that of his beneficiary, or from making any profit for himself out of his position, or his knowledge gained therein, applies not only to formal trustees and direct agents for hire, but also to gratuitous agents, to sub-agents, to the partners and employees of agents, and to those who officiously intermeddle in the management of business for others.   2 Sugden on Vendors [8 Am. Ed.]. p. 408 and notes; *Keech v. Sanford*, 1 White & T. Ldg. Cases [4 Am. Ed.], p. 62; Bispham's Equity Jurisprudence [4 Ed.], sec. 93, pp. 134, 135; 2 Pomeroy on Equity Jurisprudence [1 Ed.], p. 479, sec. 956; *York Bldgs. Co. v. Mackenzie*, 8 Brown's Parl. Cases [Toml. Ed.], p. 42; *Ex parte Bennett*, 10 Vesey, 400; *Jamison v. Glasscock*, 29 Mo. 191; *Grumley v. Webb*, 44 Mo. 444; *Roberts v. Mosely*, 64 Mo. 511; *Baker v. Railroad*, 86 Mo. 75; *Davis v. Kline*, 96 Mo. 401; *Hickman v. Link*, 97 Mo. 493; *Allen v. DeGroodt*, 98 Mo. 159; *Tate v. Williamson*, L. R. 1 Eq. 528; *Hobday v. Peters*, 28 Beav. 349.   (5) The proof of the facts warranting the finding of a constructive trust as well against Darby as against Smith, was clear, unequivocal and distinct, and well justified the conclusion of the trial court.   (6) Mrs. Washington's equitable title to the interest acquired by Smith from Darby, and her right of action to have him decreed a trustee as to it, could be and were conveyed by her to Fisher by her deed of 1881, and thence by the later deeds to plaintiff.   She was the owner of an equitable estate in the land under a constructive trust.   That was as capable of alienation as one existing by virtue of an express trust.   The conveyance of his interest by the owner of a trust arising by construction passes to his grantee all his rights of action as such owner to file a bill to establish the trust or to compel the trustee to account, or to do any other duty.   No foundation

exists for a contention that Mrs. Washington could not assign her right to have him decreed a trustee. 1 Pomeroy on Equity Jurisprudence [1 Ed.], sec. 375, pp. 409 and 410, and note 1; 2 *Idem*, sec. 989, p. 536 and sec. 1058, p. 632; 2 Story's Equity Jurisprudence [12 Ed.], sec. 1050, pp. 271 and 272 and note; 1 Perry on Trusts [2 Ed.], sec. 227, p. 278; *Stump v. Gaby*, 2 De G., M. & G. 623; *Baker v. Whiting*, 3 Sumner, 475; *Burrill v. Dickinson*, 1 Eq. (L. R.) 337; *McMahon v. Allen*, 35 N. Y., 403; *Street v. Goss*, 62 Mo. 229; *Melton v. Smith*, 65 Mo. 315; 1 Revised Statutes, 1879, secs. 668, 2354, 3462. (7) It is well settled in Missouri that any equitable interest in land of a debtor is vendible on execution, and that the purchaser can maintain a suit to establish his equitable right. *Rankin v. Harper*, 23 Mo. 579; *Eddy v. Baldwin*, 23 Mo. 588; *Bobb v. Woodward*, 50 Mo. 101; *Morgan v. Bouse*, 53 Mo. 219. (8) The deed of Robt. B. Wade to plaintiff, of July 28, 1883, operated to convey to it his equitable interest in the one-fifteenth which Smith was then holding in trust for him, and to vest in it the right to bring whatever actions he could have brought to establish or enforce such trust. In any such action so brought by it, the question of whether it, in buying from him, exceeded its charter powers with reference to the acquisition of lands, would not be relevant, and could not be raised. *Railroad v. City*, 66 Mo. 251; *Thornton v. Bank*, 71 Mo. 221; *Ins. Co. v. Hauck*, 71 Mo. 469; *Drug Co. v. Robinson*, 81 Mo. 19; *Sug. Ref. Co. v. El. Co.*, 101 Mo. 192; *Chambers v. City*, 29 Mo. 573; *Land v. Coffman*, 50 Mo. 243; *Shewalter v. Pirner*, 55 Mo. 219; *Ragan v. McElroy*, 98 Mo. 352. (9) The only exceptions to the rule prohibiting collateral inquiry by private citizens into supposed illegal acts of corporations, is where express legislative permission is granted therefor. *Martindale v. Railroad*, 60 Mo. 508; *Kinealy*

*v. Railroad*, 69 Mo. 663; *Hovelman v. Railroad*, 79 Mo. 633. (10) That plaintiff was not in possession of the one-fifteenth interest when suit was begun affords no ground for denying it relief. Its title to it is equitable only, not legal. It is only where a plaintiff has the legal title that a bill to remove a cloud will not lie unless he is in possession. The relief prayed was necessary to enable it to get possession as against Smith or anyone else. *Mason v. Black*, 87 Mo. 346; *Beadle v. Mead*, 81 Mo. 297; *Graves v. Ewart*, 99 Mo. 18; 3 Pomeroy on Equity Jurisprudence [1 Ed.], sec. 1399, p. 436 and note. (11) All acquisitions and gains made by the trustee by means of the trust belong to the beneficiary. And the trust will attach to the property which is the product and substitute for the original thing, as far as it can be traced. *Phillips v. Overfield*, 100 Mo. 466; *Patterson v. Booth*, 103 Mo. 402; *Parker v. Straat*, 39 Mo. App. 616; *Butler v. Lawson*, 72 Mo. 227; *Pennell v. Deffell*, 4 De G., M. & G. 372; *Fox v. Mackreth*, 1 Wh. & Tud. Ldg. Cases [4 Ed.], pp. 188, 212, 234, 237; *Oliver v. Piatt*, 3 How. (U. S.) 333; Bispham's Equity Jurisprudence [4 Ed.], sec. 86, pp. 127, 128; 1 Perry on Trusts [2 Ed.], pp. 515, 518, sec. 427-431; 2 Pomeroy on Equity Jurisprudence [1 Ed.], p. 626, sec. 1051, note 1. (12) Plaintiff's cause of action was not barred by the statute of limitations. *First.* Not by the five year statute, because it does not govern in actions for land. *Bobb v. Woodward*, 50 Mo. 103; *Dunn v. Miller*, 96 Mo. 324; *Robinson v. Ware*, 94 Mo. 678. *Second.* Nor by the ten year statute, because, as to Darby, it did not begin to run till he set up an adverse claim in October, 1880, by selling to Smith and assigning him the deed. Till then, he was declaring to Mrs. Washington that he claimed nothing; that her deed was of no value and he had destroyed it. He so wrote her on June 28, 1876,

VOL. 117, APRIL TERM, 1893.            285

The Conn. Mutual Life Ins. Co. v. Smith.

less than ten years before the suit was begun.  *Butler v. Lawson*, 72 Mo. 249; *Rogers v. Brown*, 61 Mo. 187; *Adair v. Adair*, 78 Mo. 634; *Lewis v. Schwenn*, 93 Mo. 26; *Booker v. Armstrong*, 93 Mo. 49; *Green v. Turner*, 38 Iowa, 112; 2 Jones on Mortgages [4 Ed.], sec. 1159, p. 104.   (13) Plaintiff's suit was not barred by laches. Its right is clear under the evidence, and there were no countervailing circumstances which would warrant the adoption of any other period for barring its right than that fixed by the statute of limitations.   In such cases mere lapse of time short of the statutory period does not operate to bar.   *Kelly v. Hurt*, 61 Mo. 464; *Kelly v. Hurt*, 74 Mo. 561; *Spurlock v. Sproule*, 72 Mo. 504; *Gordon v. Lewis*, 88 Mo. 381; *Kline v. Vogel*, 90 Mo. 239; *Dunn v. Miller*, 96 Mo. 324.   (14) Our statutes of limitation apply as well to actions in equity as to those at law.   *Dunn v. Miller*, 96 Mo. 337; *Kline v. Vogel*, 90 Mo. 239; *Gordon v. Lewis*, 88 Mo. 378; *Rogers v. Brown*, 61 Mo. 187; *Kelly v. Hurt*, 61 Mo. 464; *Kelly v. Hurt*, 74 Mo. 561.   (15) And where an express statute applies to an equitable action, mere delay in bringing it short of the statutory period will not bar.   *Lux v. Haggin*, 69 Cal. 267; *Reed v. West*, 47 Texas, 240.

*Henry H. Denison* for defendant appellant.

(1) The Connecticut Mutual Life Insurance Company has no power to take, purchase or hold real estate for any purpose whatever, or to acquire the same in any manner whatever, outside of the proviso limitations and restrictions of the first section of its charter. *Commonwealth v. Railroad*, 27 Penn. 351; *Leazure v. Hilligas*, 7 S. & R. 319; *Russell v. Topping*, 5 McLean, 194; 3 Priv. Laws of Conn. 643; General Statutes of Conn. 1875, sec. 15, p. 354; General Statutes

of Conn. 1888, sec. 2966, p. 646; *Isham v. Avery*, 1 Root, 100; *Holebrook v. Lucas*, 1 Root, 199; *Freeman v. Thompson*, 1 Root, 402; *Sherwood v. Barlow*, 19 Conn. 471; *Sherwood v. Waller*, 20 Conn. 262. (2) A corporation is governed by, and subject to, the statute law of the state of its origin, as well as by the charter by which the state has given it existence. *Railroad v. Chapman*, 38 Conn. 56; Taylor on Private Corporation [2 Ed.], sec. 390; *Relf v. Rundle*, 103 U. S. 222; *Railroad v. Gebhard*, 109 U. S. 537; *Thompson v. Waters*, 25 Mich. 214; Ang. & Ames on Corporations [11 Ed.], sec. 265, p. 266; *Indiana v. Woram*, 6 Hill, 33; *State v. Nashville University*, 4 Humph. 157; *St. Louis v. Rogers*, 7 Mo. 19; *Root v. Goddard*, 3 McLean, 102; 1 Waterman on Corporations, p. 546; *Bard v. Poole*, 12 N. Y. 495; *Hoyt v. Sheldon*, 3 Bosw. 267; *Com. Union Co. v. Scammon*, 102 Ill. 46; *Railroad v. Com'rs Coffey Co.*, 6 Kan. 245. (3) The plaintiff is especially limited in its powers and capacity to acquire real estate by the terms of its charter, and the statute law of the state of its origin. 3 Priv. Laws Conn. (1846), sec. 1, pp. 643, 644; Laws Conn. on Priv. Acts, January Session 1881, p. 10; General Statute of Conn. 1875, sec. 15, p. 354; 1888, sec. 2966, p. 646; *Isham v. Avery*, 1 Root, 100; *Holebrook v. Lucas*, 1 Root, 199; *Freeman v. Thompson*, 1 Root, 402; *Sherwood v. Waller*, 20 Conn. 262; *Goodman v. Newell*, 13 Conn. 75. (4) The plaintiff is permitted by comity to exercise in this state only such powers as it has been endowed with by the state of its origin. Revised Statutes of Missouri 1889, secs. 2508, 5911, 5924, 5925; 2 Kent's Commentaries [9 Ed.], p. 365; Taylor, Law Priv. Corporations, sec. 390; 2 Morawetz on Priv. Corporations, secs. 963, 964, 1061, 1091; Dicey on Domicil, 198; 1 Redfield on Railways, p. 51; Greene's Brice's *Ultra Vires*, note to p. 63; Cooley's

Constitutional Limitations [5 Ed.], p. 153; *Bank v. Simpson,* 1 Mo. 164; *Bank v. Hammond,* 1 Mo. 186; *Hamtramck v. Bank,* 2 Mo. 169; *Blair v. Ins. Co.,* 10 Mo. 560; *Railroad v. Marion Co.,* 36 Mo. 294; *Railroad v. Seely et al.,* 45 Mo. 220; *Railroad v. Tygard,* 84 Mo. 269. (5) A person injured by the *ultra vires* acts of a corporation may show its want of capacity. *Railroad v. Winkler,* 33 Mo. 354; *Railroad v. Proctor et al.,* 29 Vt. 96; *Appeal of Electric Light Co.,* 122 Penn. State, 154; 9 Am. St. Rep. 79. (6) The bill shows that the plaintiff, complaining· of an alleged fraud on a third party, has no interest in the subject-matter of the action. Story's Equity Pleading, secs. 260, 261; Mitford, Ch. Practice, 154, 163, and cases cited; *Stevenson v. Newnham,* 13 C. B. Rep. 285; *Parker v. Patrick,* 5 Term Rep. 175; *Pilbrow v. Pilbrow,* 5 Railway Cases, 89; *Murley v. Sherren,* 35 Eng. C. L. 519; *Touch v. Parson,* 3 Burrow, 1804. (7) A right of action in equity to set aside a conveyance for alleged fraud is not a vendible commodity and is against public policy. *Brush v. Sweet,* 38 Mich. 574; *Jones v. Babcock,* 15 Mo. App. 149; Story's Equity, 1040; *Norton v. Tuttle,* 60 Ill. 130; *Morrison v. Deaderich,* 10 Hump. (Tenn.) 342. (8) This proceeding was an afterthought. The deed upon which it is based was taken more than a year after the plaintiff was fully protected so far as concerned the land it could lawfully take. *Russell v. Topping,* 5 McLean, 194; *Bank v. Risley,* 4 Denio, 480. (9) The bill shows that it is merely one to remove a cloud upon title, and brought by a party out of possession. *Harland v. Tel. Co.,* 32 Fed. Rep. 305, and authorities cited; s. c., 33 Fed. Rep. 199; *Clark v. Ins. Co.,* 52 Mo. 272; *Appleton v. Ford,* 23 Ark. 746. (10) The bill does not allege that plaintiff is remediless at law. *Greenwall v. Duncan,* 16 Fed. Rep. 35; *Clark v. Ins. Co.,* 52 Mo. 272; *Mason v. Black,* 87 Mo.

329. (11) The bill shows upon its face an utter absence of injury. *State ex rel. v. West,* 68 Mo. 229; *Lenox v. Harrison,* 88 Mo. 491; *Case v. Kelley,* 133 U. S. 29. (12) The interest which defendant holds in the property described in the petition is less than he was entitled to receive through his deeds from Morrison.

*Alexander Martin* also for defendant appellant.

(1) The title acquired by defendant was not impressed with a trust of any kind in favor of Mrs. Washington or her assignees as against Smith. This case does not fall within the rule disabling a tenant in common from buying for his own benefit an outstanding adverse title. *Rector v. Waugh,* 17 Mo. 14; *Fallon v. Ch.,* 26 Am. Rep. 164; *Sneed Heirs v. Atherton,* 32 Am. Dec. 70. (2) The plaintiff's rights, if any it ever had, have been lost by laches and estoppel. *Kline v. Vogel,* 90 Mo. 239; *Prichard v. Bliss,* 67 Mo. 183; *Kelly v. Hurt,* 61 Mo. 463; *Kelly v. Hurt,* 74 Mo. 561. A court of equity does not lend a helping hand but to the prompt and vigilant. *State ex rel. v. West,* 68 Mo. 232; *Landrum v. Bank,* 63 Mo. 48; *Moreman v. Talbot,* 55 Mo. 392; *Bradshaw v. Yates* 67 Mo. 221; *Lenox v. Harrison,* 88 Mo. 491. See further *Twin Lick Oil Co. v. Marbury,* 91 U. S. 591; *Schradski v. Albright,* 93 Mo. 42; *Badger v. Badger,* 2 Wallace 87; *Sullivan v. Railroad,* 94 U. S. 806; *Richards v. McCall,* 124 U. S. 183; *Speidel v. Henrici,* 130 U. S. 387. (3) A petition will be held bad on demurrer, if it appears that the claim is barred by reason of laches on the part of the plaintiff, independently of the statute of limitations. *Bliss v. Prichard,* 67 Mo. 181, and cases cited and commented on; see also *Boom Co. v. Railroad,* 139 U. S. 684; *Underwood*

*v. Dugan*, 139 U. S. 380. (4) The plaintiff's right of action has been barred by the statute of limitations. Limitations as applied to equitable suits, have been considered by our supreme court in several contradictory opinions. It is necessary to ascertain as near as possible, the precise doctrine which prevails in this state, for the purpose of applying it to the facts of this case under the pleas which have been made. Before our statute was held to cover equitable actions, the doctrine prevailing in equity was as follows: "When an action upon a legal title to land would be barred by the statute, courts of equity will apply a like limitation to suits founded upon equitable rights to the same property." *Elmendorf v. Taylor*, 10 Wheat. 176; *Miller v. McIntyre*, 6 Pet. 66; *Beaubien v. Beaubien*, 23 How. 207; *Wisher v. Barnet*, 4 Wash. 66, 638; *Kam v. Bloodgood*, 7 John. Ch. 110; *Michoud v. Girod*, 4 How. 560. (5) The statute of limitations runs as to constructive trusts from the date at which an action could be brought to enforce them. *Smith v. Records*, 52 Mo. 581; *Keeton v. Keeton*, 20 Mo. 530. The statute runs whether the fraud upon which the implied trust is raised is known or not. *Rogers v. Brown*, 61 Mo. 187; *Hughes v. Littrill*, 75 Mo. 573.

SHERWOOD, J.—Upon the evidence adduced in support of the issues made by the pleadings, various questions arise requiring consideration.

I. The settled law of this state as illustrated by frequent instances in this court is that the capacity of a corporation to take a conveyance of land cannot, after the transfer has reached completion, be called in question in a collateral way, but by the state and not by a private suitor. This doctrine applies to all classes of actions and in every variety of cases. *Chambers v. City*, 29 Mo. 573; *Land v. Coffman*, 50 Mo. 243;

*Railroad v. City*, 66 Mo. 251; *Thorton v. Bank*, 71 Mo. 221; *Shewalter v. Pirner*, 55 Mo. 219; *Ragan v. McElroy*, 98 Mo. 352, and other cases.

The only exception to the rule which prohibits collateral attack by private persons on such conveyances or other unauthorized acts of a corporation, is where such attack is authorized by express legislative permission. *Martindale v. Railroad*, 60 Mo. 508; *Kinealy v. Railroad*, 69 Mo. 663; *Hovelman v. Railroad*, 79 Mo. 633. This is the rule also announced by the supreme court of the United States. *Bank v. Matthews*, 98 U. S. 621, which overruled on this point, *Matthews v. Skinker*, 62 Mo. 329.

As shown by the brief of plaintiff's counsel, this rule still prevails in that court, and in many of the states. This rule, however, is entirely consistent with another rule announced by the same court in *Case v. Kelly*, 133 U. S. 28, regarding the refusal of a court to interfere in behalf of a corporation whose rights rest only in *executory contract* which it seeks outside of the provisions of its charter, to have enforced. This distinction is also taken in *Land v. Coffman, supra*. But it seems that there was no evidence that the purchase by the plaintiff from Wade (who bought from Fisher, who bought from Mrs. Washington, the original owner) was for an unauthorized purpose. Absent any evidence to the contrary, a proper and legitimate purpose will be presumed. *Bank v. Risley*, 19 N. Y. 369.

II. Having determined that the capacity of the plaintiff corporation to take whatever title Wade possessed, could not collaterally be attacked, the next point for examination is whether Mrs. Washington's title to the property in controversy was such an one as possessed the elements and attributes of transferability.

If indeed Mrs. Washington was the possessor of an interest in the land in controversy and she was defrauded out of it, there can be no question under our statutory provisions and frequent rulings on the point, but that she could maintain any suitable action or proceeding to regain whatever rights she had lost by reason of any fraud practised against her; and any such right, whether legal or equitable, whether sounding in contract or sounding in tort, which survived the person, are transferable. 1 Revised Statutes, 1879, secs. 2354, 3462. Thus, in *Street v. Goss*, 62 Mo. 226, it was ruled that the equitable right of a debtor to have a conveyance obtained by an agent of his principal through fraud, was vendible under execution.

In an early case it was held that under the new code a right of action for the conversion of property was assignable, and that the assignor could sue in his own name. *Smith v. Kennett*, 18 Mo. 154. See also *Melton v. Smith*, 65 Mo. 315, and cases cited. In the cases of *Snyder v. Railroad*, 86 Mo. 613, and *Doering v. Kenamore*, 86 Mo. 588, it was decided that under the code a right of action arising from a tort to property was assignable. Some observations which fell from Judge BLISS in *Smith v. Harris*, 43 Mo. 557, were based on the case of *McMahon v. Allen*, 34 Barb. 56, subsequently overruled on appeal in 35 N. Y. 403, after an elaborate review of the authorities both in England and this country, in which case it was held that a conveyance obtained by fraud and in violation of a fiduciary relation might be the subject of a grant or assignment which would enable the grantee or assignee to file a bill to set aside the previous conveyance.

On the same footing in equity and governed by the same rules are those cases where a right to establish a trust in lands, either actual or constructive, has been transferred. 2 Story on Equity Jurisprudence

[13 Ed.], sec. 1050; *Stump v. Gaby*, 2 De G., M. & G. 623; *Gresley v. Mousley*, 4 De G. & J. 78.

III. Having ascertained that the plaintiff corporation had the capacity to take the conveyance upon which this proceeding is grounded, a capacity which cannot at least be questioned collaterally, and that Mrs. Washington, if defrauded, had a tangible interest in the litigated property, capable of recognition in a court of equity, and capable of being transferred by mesne conveyances from Mrs. Washington to Fisher, and from the latter to Wade and from him to the plaintiff, it is next in order to determine whether Mrs. Washington was defrauded as charged in the petition. Intimately connected with this question is one respecting notices to the alleged defrauder.

Did defendant have notice? This question will be considered and answered from various points of view. Notice in this connection does not mean positive information brought directly home to the party sought to be charged. Anything which will put a prudent man upon inquiry is notice. And gross negligence in failing to make inquiry when the *surrounding facts* suggest the existence of others, and that inquiry to be made is tantamount in courts of equity to notice. *Major v. Bukley*, 51 Mo. 227; *Leavitt v. LaForce*, 71 Mo. 353; *Roan v. Winn*, 93 Mo. 503. This is the universally prevalent doctrine of courts of equity in all jurisdictions. 2 Pomeroy on Equity Jurisprudence [2 Ed.] secs. 596, 597, 598, 599, 600, *et seq.* And actual notice may be inferred from circumstances and by reasonable deductions therefrom. *Ibid; Brown v. Volkening*, 64 N. Y. 76. Courts of equity, since their earliest foundation, have always recognized that the still, small voice of suggestion, emanating as it will from contiguous facts and surrounding circumstances, pregnant with inference and provocative of inquiry, is

as potent to impart notice as a presidential proclamation or an army with banners.

In this case, however, there is no occasion to invoke inferences from surrounding circumstances or draw deductions from conceded facts, because here the testimony is uncontradicted that: *First*. Mrs. Washington told defendant in 1874, at the time he opened negotiations with her respecting the land, of Darby's contract, its non-performance and its rescission. And in his testimony taken in another cause defendant admitted the same thing. Defendant was also notified by seeing and taking from Darby in October, 1880, an assignment of the *very contract itself*, whereby Darby had undertaken to recover Mrs. Washington's interest for her; a contract then over seven years old and wholly unperformed. Not content with that, defendant even took an assignment of the *deed* to Darby, and of Darby's interest therein, paying him therefor $100, a beggarly pittance for property then worth some $15,000. *Second*. The purchase from Darby, by defendant, of such valuable property at such a paltry figure is evidence of notice in and of itself and shows, when coupled with the other pregnant circumstances mentioned, that the transaction was merely colorable and not a *bona fide* purchase. *Eck v. Hatcher*, 58 Mo. 235; *Lionberger v. Baker*, 88 Mo. 454; *Hoppin v. Doty*, 25 Wis. 573; 2 Pomeroy on Equity Jurisprudence [2 Ed.], section 600. *Third*. But in this case defendant pleaded as an affirmative defense that he "acquired the title of Darby for full value and without notice of the supposed fraud and breach of trust of Darby." This plea, it will be observed, lacks the averment that the purchase was made *in good faith*. This is a serious defect. 2 Pomeroy on Equity Jurisprudence [2 Ed.], section 762. But, waiving such defect, treating the plea as sufficient in fullness and specific averments, still the

*onus* of proving himself a *bona fide* purchaser rested on defendant. *Jewett v. Palmer*, 7 John Ch. 65. *Fourth.* That the burden rests on the shoulders of him who pleads it, is especially true where the vendor of the title in question was guilty of a fraud, in which case the same rule applies to the purchaser under such fraudulent grantor as applies to the purchaser of negotiable paper which had its origin in fraud. *Sillyman v. King*, 36 Iowa 208, and cases cited. That Darby was guilty of fraud in the transaction is too plain for argument; and that defendant was equally culpable does not admit of question. *Fifth.* Moreover, charged as was defendant with fraud, his failure to appear and testify in denial of the charge of something peculiarly within his own knowledge, carries with it the usual unfavorable and damaging presumptions. *Henderson v. Henderson*, 55 Mo. 534; *Cass Co. v. Green*, 66 Mo. 498; *Goldsby v. Johnson*, 82 Mo. 602; *Leeper v. Bates*, 85 Mo. 224. On this branch of the case then we hold that defendant had ample and actual notice and with such notice he deliberately, so far as in him lay, defrauded Mrs. Washington.

IV. Not only was defendant blameworthy in the manner already noted, but he was also in other particulars. That he occupied toward Mrs. Washington and her interests a fiduciary relation cannot, considering the evidence, admit of doubt. That this was true upon the making of the first contract which he made with her in February, 1874, is quite apparent. The contract subsequently made by Mrs. Washington with Morrison was but substitutionary of the first one made by her with defendant. This is obvious for many reasons. His interest in the litigated land still continued to be bound by a lien in Mrs. Washington's favor, in addition to the part reserved to her, which was one-fifteenth, the other two-fifteenth having been conveyed to Morrison

on the "joint account" of defendant and himself. After this, defendant took depositions; attended trials; prepared bills of exceptions; effected compromises; drew deeds therefor, in which Mrs. Washington was awarded one-fifteenth, and he received from her deed of compromise in return, and recorded the same; and he drew petitions, carried on correspondence with Mrs. Washington, informing her from time to time of what was being done; receiving letters from her showing the reliance she placed in him. In short, defendant, in all except the bare name, was the attorney of Mrs. Washington, and certainly was her trusted agent. Whether he did so gratuitously or not, does not alter his position towards her or affect its fiduciary character. And the *status* of defendant towards Mrs. Washington is not changed because she wrote similar letters to Morrison.

This being the case, all the gains of defendant by means of his position, whether through the Darby deed or otherwise, belonged to Mrs. Washington, of which gains he could in nowise deprive her. *Jamison v. Glascock*, 29 Mo. 191; *Bent v. Priest*, 86 Mo. 475, and cases cited.

The doctrine which dominates a trustee in this regard applies not only to trustees of technical or express trusts, but to all occupying a similar relation, whether cotenants, agent for hire, gratuitous agents, sub-agents, partners and employees of agents, and even to officious intermeddlers in the business of others, or who, by being employed in the affairs of another, have acquired a knowledge of his property. 2 Sugden on Vendors [8 Am. Ed.], pp. 408 *et seq.* and notes; *Baker v. Whiting*, 1 Story, 218; Bispham's Principles of Equity [4 Ed.], section 93; *Keech v. Sandford*, 1 White & Tudor's Leading Cases [4 Am. Ed.], 62; *Allen v. DeGroodt*, 98 Mo. 159.

Because of the foregoing considerations it necessarily results that Mrs. Washington was entitled to her full one-fifteenth in all of the lands in United States survey 2500, and the like amount of all moneys derived from compromises or exchange and the plaintiff, as the assignee of her rights, should have prevailed in securing that *quantum* of interest. This is true, unless the statute of limitations has created a bar, which point is next for consideration.

V. As to that point, it is sufficient to say that, as this suit concerns real estate, ten years is necessary to constitute a bar; and the same length of time is requisite where it is sought to enforce trusts in real estate. *Buren v. Buren*, 79 Mo. 538, and cases cited. Now, in this case, from the time of defendant's dealing with Darby to the time when this proceeding was instituted was only about five and one-third years. Until that occurrence there was no adverse holding or adverse claim on Darby's part. Besides, as a fraud was practiced when the Darby deed was delivered, ten years would be allowed the injured party from that time in which to discover that fraud and to bring his action. 2 Revised Statutes, 1889, sec. 6775, sub. div. 5. Furthermore, the question of defendant's right to the land in question was being litigated. *Smith v. Washington*, 11 Mo. App. 520; s. c., 88 Mo. 476.

VI. In addition to what heretofore has been said respecting the Darby deed and the defendant's claim thereunder, it may be remarked that, even if defendant had acquired any valid right under that deed, it would have been swept away, as the result of the litigation in case 55597, reported as above; for in that case the right of defendant to claim against Mrs. Washington the interest derived under the Darby deed was distinctly adjudged against him, judgment going in her favor. This adjudication occurred in 1882, and though

made on a demurrer to the petition, yet, as the demur-
rer went to the merits, the whole matter in controversy
became *res judicata.* Bigelow on Estoppel [5 Ed.], 56.
And it was as competent to offer the judgment in evi-
dence as it was to plead it, and the effect was the same.
*Garton v. Botts,* 73 Mo. 274, and cases cited.

Defendant's testimony taken in other causes
abundantly shows that he relied on the Darby deed,
but before that conceded that Mrs. Washington was
entitled to one-fifteenth, for, amongst other things, he
says: "There never was any dispute about Mrs.
Washington's title to one-fifteenth of that land, *until
I discovered the Darby deed.*"

VII. Something has been said about plaintiff's
inability to obtain equitable relief by removing a cloud
from its title because defendant Smith was in pos-
session. There would be weight in this suggestion if
plaintiff had the legal title, but as it has not, resort
to a court of equity was a necessity, both for that pur-
pose and in order to divest title and declare a trust.
*Mason v. Black,* 87 Mo. 329, and cases cited.

VIII. It was proper for the court to permit plain-
tiff, before the entry of the final decree, to amend its
petition to conform to the facts proven; and there was
no error three days after the entry of the final decree to
refuse defendant permission to file an amended answer;
nor does it appear in what the proposed amendment
consisted, whether or not it was material. *Howell v.
Stewart,* 54 Mo. *loc. cit.* 407, 408.

IX. As before indicated, the decree entered, while
correct so far as it went, did not go far enough, because
it did not accord to plaintiff as extensive relief as that
to which it was entitled; but the decree went too far
when it required plaintiff to repay to defendant the
$100, with interest which he had paid Darby. This
money having been paid by defendant of his own

wrong, and in furtherance of an *actual* fraud, a court of equity will not aid him to recover it, but will leave him where it finds him. *Gilbert v. Hoffman*, 2 Watts, 66; *Jackson v. Summerville*, 1 Harris, 359; *Sands v. Codwise*, 4 Johns. 597; *McCaskey v. Graff*, 23 Pa. St. 321.

For the foregoing reasons, we reverse the decree and remand the cause with directions that the lower court, in conformity to this opinion, do enter a decree in favor of plaintiff, treating defendant as a trustee in all respects and compelling him to account for all gains made in that capacity to the extent of Mrs. Washington's equitable interest in the property, whether in land or money. All concur.