## DUNIVAN, Appellant, v. DUNIVAN et al.

**Division One, Juné 12, 1900.**

1. **Equity:** REVIEW OF EVIDENCE. The appellate court will examine the facts in equity cases and render a judgment for the right party, notwithstanding the finding of the trial court. But proper deference is always accorded such finding, especially where the witnesses were present at the trial and testified orally.

2. ————: ————: CASE STATED. Plaintiff made a mortgage upon his land, and about to leave the State for a time, gave to his son enough money to pay the debt, requested him to discharge it, and alleges that he was afterwards told by him that he had done so. He charges that the son, with a design to cheat him, fraudulently directed the land to be sold, bought it in at the sale, received a deed therefor and then sold it to another defendant, who had due notice of the fraudulent acts of his son, and conspired with him in his designs to cheat plaintiff, who asks that the sale be set aside, etc. The present owner denied notice or knowledge and claimed to be an innocent purchaser. There was abundant evidence to support plaintiff's averments, and strong evidence to support the son's action as honest and fair, and abundant evidence to support the finding for the other defendant. *Held,* this being true this court can not properly interfere with the judgment.

Appeal from Howell Circuit Court.—*Hon. W. N. Evans,* Judge.

AFFIRMED.

*A. H. Livingston* for appellant.

(1) The burden of proof is on defendant to show that the purchase was made in good faith, for value, and without notice, and without knowledge of such facts as would put him upon inquiry. Ins. Co. v. Smith, 117 Mo. 261. (2) The fact that the land for which defendant was paying

$1,000 was mortgaged for $35, and was sold under such. mortgage for $42, was enough within itself to charge him with notice, or put him upon inquiry. Eck v. Thatcher, 58 Mo. 225. (3) S. F. Milner purchased the land, gave his notes for the purchase money, but had the deed executed to his wife. Even if the land had been paid for by defendant, her husband was her agent, and notice to him was notice to her. But the court found that neither had notice. Notice to the husband is notice to the wife. Wade's Law of Notice (2 Ed.), sec. 679.

*James Orchard* for respondents.

(1) If a transaction consists as well with honest and fair dealing as with a fraudulent purpose it should be referred to the better motive. Robertson v. Dryden, 118 Mo. 534. (2) The law is well settled that a conveyance made to a *bona fide* purchaser for value without notice of the fraud will not be disturbed. Wineland v. Coonce, 5 Mo. 296; Gordon v. Ritevour, 87 Mo. 61; Craig v. Zimmerman, 87 Mo. 475. The court will not assume fraud from mere obscurity or apparent fraud, but it must be proved. Bryant v. Jackson, 99 Mo. 596; Picot v. Bates, 47 Mo. 390. Nor will courts disturb title upon feasible conjectures. Evans v. David, 98 Mo. 411. (3) A person in possession and having a record title is presumed to be the owner and more especially so when he has been in possession for three years and there was nothing to indicate that any one was claiming a superior title. Rensho v. Lloyd, 50 Mo. 368; Barry v. Otto, 56 Mo. 179.

MARSHALL, J.—Bill in equity to divest title to one hundred and twenty acres of land in Howell county, filed February 9, 1897.

The plaintiff is the father of the defendant A. J. Dunivan, and in his petition he alleges that he owned the north half and the southwest quarter of the southeast quarter of section five, township twenty-one, range —, which he mortgaged on the 10th of December, 1891, to Elmer Stone, to secure his note for thirty-five dollars; that soon afterwards he went temporarily to Arkansas, but before going he arranged with his said son and paid him to pay off and discharge the mortgage, and that his son informed him afterwards that he had done so, but that in fact his son wrongfully and fraudulently, with the design and purpose of cheating him, allowed and directed the land to be sold under the mortgage, on the 28th of February, 1892, and at such sale became the purchaser of the land himself and received a deed therefor; that the defendant, Milner, with due notice and knowledge of the fraudulent purposes and acts of his son, conspired with him in the purpose and design to cheat the plaintiff, and took a conveyance to the land from his son, and is now in possession of the land. The petition then asks that the title be divested out of defendant Milner and vested in the plaintiff.

The defendant Milner pleaded that she is the owner of the land; that she purchased it from A. J. Dunivan without notice of any right, title or interest of the plaintiff, for a valuable consideration and at its true value, and in good faith.

The trial court found that A. J. Dunivan had agreed with his father to pay off the mortgage but had fraudulently permitted the land to be sold under the mortgage and became the purchaser thereof himself, and that he held the land in trust for the plaintiff, but that the defendant Milner purchased the land without notice of the fraud and without knowledge of such facts as would charge her with notice of

fraud, and therefore dismissed the bill. The plaintiff appealed.

Appellant urges this court to review the testimony and reverse the finding of facts by the trial court as to the notice of and participation in the fraud by defendant Milner, and to enter a decree here in his favor. This court will examine the facts in equity cases and render a judgment for the right party, notwithstanding the finding of the trial court. But proper deference is always accorded the finding of the trial court, especially where the witnesses were present in that court and testified orally, and its conclusions and findings will not be lightly treated nor arbitrarily disturbed. It is only where the result is manifestly wrong that this court will set aside the finding of facts of the trial court, in equity cases.

It is in the light of this rule that we approach the discussion of the facts in this case, and at the outset it is proper to say that there is an irreconcilable conflict in the testimony on both branches of the case, that is, as to the arrangement between the plaintiff and his son and as to the fraud practiced by the son upon the father, and as to the notice to the defendant Milner of the fraudulent character of the son's deed to the land. Upon the evidence adduced there is abundant room for a court to find both issues for the plaintiff, or both for the defendants, or to find the first in favor of the plaintiff and the second in favor of the defendant, as the trial court did, or vice versa.

This being true, it is not a proper case for this court to interfere with the judgment of the trial court, and we will not do so. But simply to illustrate the wisdom of this rule we will refer briefly to the testimony adduced by the respective parties in this case.

The plaintiff testifies that he owned the land in controversy of which fifty or sixty acres were in cultivation, worth

fifteen hundred dollars, on which there was a mortgage for thirty-five dollars; that he and his son, the defendant, owned a stallion together; that he took the stallion and went south, under an agreement with his son that the son should cultivate the land and pay off the mortgage and he should sell the stallion; that he left on the place forty-three head of hogs, a couple of sows with shoats, and a heifer, which he directed his son to sell if necessary to pay off the mortgage; that he could not get cash for the stallion, so he traded him for some land in Arkansas; that there was a lien on the land which the party he traded with agreed to pay off, but that the stallion got crippled and the purchaser would not pay the lien on the land; that he sent a bale of cotton from Arkansas to pay a debt he owed in Missouri, for which his son was surety, but that the son did not so apply it; that he owed quite a number of persons at the time he left Missouri, some of which debts his son was surety for and which the son paid; that he never got back any of the stock he left on the land or any money from their sale; that there were five acres which were not covered by the mortgage which the son conveyed to defendant, Milner, and after he returned to Missouri and after he learned of his son's alleged fraud on him he sold those five acres to Milner. He admits that he received a letter from his son saying the mortgage was due and telling him to sell the stallion and pay the mortgage and that he answered that he could not sell the stallion.

The only other testimony about the agreement of the son to pay off the mortgage is that of Wm. Briles, a son-in-law of the plaintiff, to the effect that about five years before the trial he heard the father and son talking about the general farm business and the father told the son "he wanted him to pay the mortgage off of the land just as quick as he could, and Jack" [the son] "said he would." This witness admitted that he had pleaded guilty to a charge of "taking

some hides from a man that wasn't legal," so that apart from the lack of consideration to support the promise of the son as it is stated by this witness, the testimony is not very strong support for the plaintiff's contention. The plaintiff also showed by the testimony of witnesses Kirkland, McCormack, Wine and Owens, that before the defendant Milner's husband purchased the land for her they told him the neighborhood talk about the title to the land being defective in that, Jack, the son, had agreed with the plaintiff to pay the mortgage but instead of doing so had let the land be sold under the mortgage and had bought it in himself. Kirkland also told Mr. Milner that the land had been "homesteaded" by the idiot son of the plaintiff with the plaintiff's assistance and that the plaintiff had traded for it in some way or other and got the deed to it.

On the other hand the son testified that he never agreed to pay off the mortgage, and never knew there was a mortgage on the land until a notice of the maturity of the debt came from the bank to his father after he had gone to Arkansas, and he sent the notice to his father and asked him what he must do about it but received no answer, and when the land was sold he borrowed the forty-two dollars from Geo. L. Garoutte and bought in the land; that before Mr. Milner bought the land he had the title examined and it was pronounced perfectly good, and that he was advised by Garoutte and others that the title was good. Mr. Milner denied the statements of plaintiff's witnesses that they told him that the son had promised the father to pay off the mortgage and had failed to do so, and said they told him that the title would not be worth a damn if Harry Dunivan, the idiot boy, came back. In this Milner is corroborated by Coleman Short, who heard what plaintiff's witness Owens told Milner. The son also denied that the father ever sent a bale of cotton to help pay off his debts.

The resume of it all is, that Harry Dunivan (the idiot son) entered the land under the "homestead laws;" the plaintiff in some way got the title from Harry, who was feeble-minded, and mortgaged it for thirty-five dollars; then the father went away with a stallion owned by himself and his son, Jack, the defendant Dunivan, and traded the stallion for some land in Arkansas and did not account to Jack for his interest in the horse; the father was largely indebted when he left Missouri and Jack was surety for some of it, and Jack paid, at any rate, some of his father's debts. When the mortgage fell due Jack notified his father and advised him to sell the stallion and pay the mortgage but the father did not answer. The land was sold and the son bought it. There is a flat conflict between the father and Jack as to the alleged agreement of Jack to pay off the mortgage, and also as to what and how many cattle and stock the father left, and as to the bale of cotton. More than two years after Jack had sold the land to Milner, the father came back, and after being fully informed as to the whole matter, he made a deed to Milner of the five acres included in Jack's deed to Milner but not covered by the mortgage. Five years, less fifteen days, after the perpetration of the alleged fraud by Jack on his father, the latter institutes this suit and asks to have all the deeds cancelled and the title vested in him.

The trial court held that the son had been guilty of a fraud but that Milner had no notice of it and was not put upon inquiry. If we should review the findings of fact, on such conflicting testimony, we would be more in doubt as to the alleged contract between the father and son as to the son paying the mortgage in consideration of the use of the land or out of the sale of the stock left by the father on the place, than we are about the notice to Milner. But conceding that Milner had notice or was put upon inquiry, with-

in the rules properly declared in Ins. Co. v. Smith, 117 Mo. 261, and assuming that Milner made inquiry, what could he have found? He would have found the legal title in the son, and a claim asserted by the father and denied by the son that the son held the title in trust for the father because of a disputed parol agreement by the son to pay the father's debt which was secured by a mortgage on the land, and that after the son had failed to keep such alleged agreement, the father had allowed the matter to stand in that shape, and the records of the county to assert to the world that the son had a good title, for more than two years after the fraud was perpetrated. Such conduct does not show an outraged parent's indignation against a faithless son, nor does it show diligence on the father's part to protect his rights or to prevent innocent persons from acquiring a good title from the son. But suppose Milner had probed deeper and found, as this record discloses, that the son did not keep his agreement and notified his father (as the latter says) that he had been sick and unlucky and could not pay and that the land was about to be sold under the mortgage and had advised his father to sell the stallion (in which the son had a half interest but which the father had previously traded for land and had not accounted to his son for his share) and pay the mortgage and the father had paid no attention to it, but had permitted the sale to go on and the land to be sold and had raised no question about it for more than two years afterwards, what would have been the conclusion which Milner, or any prudent man, would have been forced to draw from such facts and circumstances? Manifestly that the father was asserting no title to the land and that the son had a right to sell it.

If it be conceded, as to which, however, there is a flat conflict in the evidence, that the son broke faith with the father and did not protect the land from the mortgage, it

must also be conceded, as to which there is no conflict in the evidence, that the father broke faith with the son as to the sale of the stallion and the division of the proceeds equally between them, when he traded the stallion for land in Arkansas, and took the title in his own name. Thus it seems each was willing to call it "quits," until the father found the son had sold the Missouri land for $1,000, and the father owed $150 on the Arkansas land which he was unable to pay, and then he came back and offered to compromise if the son or some one else would pay the $150 on his Arkansas land, and failing to effect such an arrangement he waited until within fifteen days of the time when his action would have been barred by the five year statute of limitation, and then brought this suit.

Comment is unnecessary. But all of this is referred to for the purpose of showing the wisdom of the rule which impels this court, even in equity cases, to defer to the finding of fact by the trial court, and not to interfere except when the judgment of that court is manifestly unjust. No such condition is presented by this record. On the contrary the result reached by the trial court was for the right party, and therefore its judgment is affirmed.

All concur.